*In re* SNYDER.

(*Circuit Court, E. D. Tennessee.* 1885.)

ATTORNEY AT LAW—DISBARMENT—ABDUCTING INSANE PERSON—FRAUDULENTLY OBTAINING MONEY.

A weak-minded man, laboring under the hallucination that he had committed a crime, fled to Tennessee, and there concealed himself, but was discovered by certain detectives and officers, who, supposing he was in fact a criminal, had him arrested and committed to jail in the hope of obtaining a reward. They took an attorney at law into their confidence, and, acting with him, and under his advice, after learning that the supposed criminal was in fact innocent, procured his release fraudulently, and by preparing false and illegal papers; and after receiving and dividing large sums of money sent to their prisoner by relatives, carried him in disguise to New York and shipped him to Liverpool, where he was found by his relatives and brought home. *Held,* that this conduct on the part of the attorney was sufficient to justifying striking his name from the roll of attorneys, and disbarring him from practice.

Proceeding to Disbar Attorney.

Mr. *Snyder,* (assisted by *Moses Clift,*) *pro se.*

BAXTER, J. On the trial of a civil suit of *Geo. H. Thomas* v. *The Respondent and others*, had in this court at its October term, 1884, the following extraordinary testimony was elicited: The plaintiff, Thomas, was an educated weakling. He had lived for a while just prior to his arrest, as hereinafter shown, in southeastern Missouri, where he was involved in a good deal of troublesome civil litigation, and to escape therefrom he fled to and took refuge with a friend at Bartow, Florida. From this place he wandered aimlessly to Chattanooga. Here he took lodging under an assumed name with an obscure family in the suburbs of the city. He was guilty of no criminal offense against the laws of Missouri, or any other sovereignty, but he was controlled by an unfounded and vague apprehension that his adversaries in Missouri would combine and charge him with some crime as a pretext for his arrest and extradition to enable them to bring other suits against him in that jurisdiction. Under this hallucination he contemplated flight to South America. While impelled by these fears, he wrote letters and tore them into pieces and scattered the fragments around his room. This singular and suspicious conduct attracted the attention of the city police, who gathered up the scattered fragments of his writings, and from them concluded that he had committed some grave criminal offense in Missouri from which he was endeavoring to escape. The policemen took Snyder, who is an attorney at law, into their confidence. After consultation they not unnaturally reached the conclusion that he was a fugitive from justice, for whom there was probably a reward offered. In this belief, which I have no doubt they honestly entertained, they determined to arrest him. A warrant was then obtained charging him with being "a fugitive from justice." It did not impute the commission of any specific crime, or allege any venue, and was consequently without authority of law. Nevertheless Thomas was arrested under it, and taken to the county jail for incarceration; but the sheriff, who is *ex officio* jailer of the county, declined to receive and detain him as a prisoner without a formal *mittimus*. Thereupon Sloop, a policeman who had been an active participant in making the arrest, and who then had him in custody, acting under Snyder's advice, applied to the justice who had issued the warrant for his arrest, told him in Thomas' absence that Thomas waived an examination, and upon this false representation, and without further inquiry, the justice issued a paper in these words:

"*State of Tennessee* v. *Geo. H. Thomas, alias Parkhurst.* Judgment that the defendant in this case waived examination through H. L. Sloop, officer, and was committed to wait further action of the court.
"G. M. SHERWOOD, J. P."

This paper, vicious upon its face, quieted the sheriff's scruples, and he consented to receive and hold Thomas as a prisoner. After taking the usual precautionary measures for his safe detention, including the taking of $200 in money, which Thomas had on his

person, he committed him to one of the cells of the jail.   Many rep-
rehensible things were said and done in connection with Thomas'
imprisonment which need not be enumerated here.   It is sufficient,
for the purposes of this case, to say that Snyder, who was jointly in-
terested with the officers in the arrest in the hope of getting a re-
ward therefor, became satisfied that Thomas was a weak-minded and
partially demented creature; that he was innocent of any crime; that
he was well connected, and could probably obtain advances from his
relatives; and that the only hope of realizing any remuneration for
his labor expended in connection with Thomas' arrest and impris-
onment was to gain the confidence of Thomas and assume the office
of his legal adviser.   To effect this end he began and continued to
play upon and intensify the prisoner's fears.   He told him that one
David Hughes, of Bartow, Florida, said that he "was wanted both
in Florida and Missouri," and followed this fabrication with a long
list of interrogatories and intimations, which were intended and cal-
culated to intensify Thomas' apprehensions.   Thus alarmed, Thomas
expressed a wish to consult an attorney.   To this request the sheriff
said, in Snyder's presence, "It is of no use for you to apply for a writ
of *habeas corpus*, for the hearing of the matter can be adjourned from
day to day, and you will simply waste what money you have."   At
this juncture, Sloop, one of the interested policemen, demanded the
key to Thomas' trunk, which the latter gave him, and the parties left
him for a while to nurse his delusion alone.   But subsequently Sny-
der returned to his cell, and told Thomas that "he had read the let-
ters found in the prisoner's trunk, and was convinced that he was
more sinned against than sinning; that there was a description of him
published in the *National Detectives' Gazette*, coupled with an offer of
$500 reward for his capture; that he (Snyder) was not interested in
the Missouri parties who wanted the prisoner, but would get his money
if the prisoner was delivered to them; that the sheriff was going, in a
few days, to Missouri, on other business, where he could get full infor-
mation, but if the prisoner could get $500, and give it to him, (Sny-
der,) he would arrange with the officers, and take him out of jail, under
the pretext of taking him to Missouri, and would, as soon as they got
out of Tennessee, turn him loose, and report that he had been taken
back to Missouri, or, if the prisoner preferred to leave the country, he
would go with and procure a passport for him; that he was an attorney,
as well as a detective, and could act as an attorney for the prisoner;
that he was on intimate terms with the officers of the jail, and would
therefore be allowed more liberties than were accorded to other at-
torneys; that the officers of the jail expected to get a part of the re-
ward offered for his apprehension, and would be on the watch; but
that something would occur to enable Thomas to get off in such a
way as that they (the jail officers) would lose their share of the re-
ward, as they were not as suspicious of him (Snyder) as they were of
others."

These suggestions produced the result they were intended to secure. Thomas accepted them as the best and surest method of escaping from the embarrassments which, in his diseased imagination, were impending over him, and retained Snyder as his attorney, and thereafter implicitly adopted and followed his counsel, without, as far as I can see, the slightest misgiving of its wisdom or fidelity. On application by Thomas, he was furnished by an uncle in Ohio with $200, and by an aunt in Connecticut with $700 more. These remittances passed through Snyder's hands. His friend in Florida sent by one Humphries, a special messenger, the further sum of $800, but, in consequence of the facts to be hereinafter stated, this last remittance was not delivered either to Thomas or Snyder. The messenger intrusted with said last-mentioned sum was a young lawyer from Florida charged with the responsibility of inquiring into the nature of the accusation against Thomas, ascertaining the facts, and taking such steps as he might, in his judgment, deem necessary and proper for his release. On his arrival at Chattanooga he promptly reported to the deputy-sheriff, who, in the absence of the sheriff, had the custody and control of the county jail and the prisoners in it, told him who he was and the object of his visit, and requested permission to see and confer with Thomas. But this request was denied, except on the condition that Snyder should be present and hear what was said. Being unable otherwise to get access to Thomas, Humphries yielded to the condition imposed, and held a short and hurried conversation with Thomas in Snyder's presence. During the interview Snyder proposed that a Mr. Blount, a friend of Humphries and a stranger in Chattanooga, should "personate an officer from Missouri and pretend that he had come for Thomas, and that he (Snyder) would get up a pretended requisition from the governor of Missouri, and get a country-justice of the peace to order Thomas turned over to Blount," and in this way "get Thomas out of jail and turn him loose." Humphries declined to adopt the proposed scheme, and withdrew from the jail. After returning to the hotel and consulting with his friend Blount, Humphries determined to retain a firm of resident lawyers to assist him in the matter. But they, too, were, after repeated efforts, unable to get access to Thomas, and, as a *dernier ressort*, proceeded to apply for a writ of *habeas corpus*, with a view of having a judicial inquiry into the cause of Thomas' detention. But, as well before as while they were engaged in procuring the writ, Snyder was actively engaged in preparing Thomas to co-operate with him in the audacious plans which he had conceived to defeat the proposed inquiry. Among other things tending to this result, he asked Thomas "if he was known in Cincinnati," and then told him "that there was a detective from Cincinnati in Chattanooga, who claimed that he had come for the purpose of taking him to Missouri," and "professed to have a requisition for that purpose; that said detective was working in conjunction with Officer Doty of the Chattanooga force; and that

v.24F,no.16—58

Doty and the Cincinnati detective were probably planning to get hold of him." This was all pure fabrication. Snyder then advised Thomas "that he had better waive, in writing, a formal requisition," so as "to put himself in shape to get off on short notice as soon as his money (requested by him from his friends) should arrive." To this Thomas assented. Snyder then prepared a paper in these words:

"Having been arrested in this city upon the charge of being a fugitive from justice, and being held under bond until a requisition can be obtained, I hereby agree to waive the procurement of a requisition, and freely and voluntarily consent to be removed from the state of Tennessee by C. E. Stanley, or any one else designated by him, upon said charge at any time,"—

—which Thomas signed. Upon the faith of this paper Sherwood, the justice who had committed him to the jail, ordered that Thomas "be consigned to the custody of C. E. Stanley, deputy-sheriff, or any person to be designated by him, for the purpose of removal from the state of Tennessee." Stanley made the following indorsement thereon: "In pursuance of the above order of the court, I have this day consigned the defendant in said case to H. L. Sloop,"—and supplemented his indorsement by a letter of instruction addressed to his friends and the general public, in which he certified—

"That Geo. H. Thomas has freely and voluntarily waived, in writing, requisition and all formalities; and Geo. M. Sherwood, justice of the peace, having directed me to convey the said Thomas to Missouri, or to designate some one to convey him there, I have transferred to Henry Sloop, policeman, all authority vested in me to so convey him. I hope my friends will assist Mr. Sloop to land him safely in Missouri.

"P. S. If Mr. Thomas, or C. C. Snyder, his attorney, wishes a few days' delay on the way to Missouri, I would advise Mr. Sloop to accede to their wishes, provided Mr. Snyder will agree not to obtain a writ of *habeas corpus.*"

Snyder was present when Thomas was discharged from jail and turned over to Sloop, and whispered to the prisoner privately, and said, "All that will be done this afternoon will be done in your interest." Sloop then directed Thomas "to follow him." The prisoner accordingly took his hand-bag, and went out, pursuant to respondent's directions, by a side door, where he found a buggy in waiting, which he entered with Sloop. They then went a circuitous route into the country, and after driving around for some time came back towards the city, stopping in a thicket near a beer garden. While on this ride, Thomas asked if the cause of his being taken out of jail was to avoid Doty and the Cincinnati detective. Sloop laughed, and said it was. Sloop fired a pistol, and told Thomas "to listen for shots in return." Several shots were heard a short distance away, and Sloop responded by another discharge of his pistol. In a short time Snyder came up in a buggy with James Turner. Thomas then wrote a letter under Snyder's direction to Humphries, in which he informed Humphries that he had employed Snyder as his attorney and did not desire any other lawyer. Snyder inquired if Thomas had any letters or other writings about his person that might serve to identify him. He then intro-

duced Turner to Thomas, and directed the latter to go with Turner. Turner then took Thomas, by unfrequented ways, a few miles into Georgia, to the home of one Little. Here they were again joined by Sloop. The three then went to Turner's; but before arriving there they held a consultation as to the best means of keeping Thomas concealed. After reaching Turner's, Snyder again appeared and represented to Thomas that "he was under a $5,000 bond to produce him in court, and that Turner, as his deputy, was, when in charge of him, responsible for the same amount, and that it would ruin both if he should escape," and that if they "saw any attempt on his part to escape, he would be shot if it was necessary to prevent his escape." Snyder then said to Turner that "he thought it would not be necessary to put irons upon Thomas; that the latter would stay all right in a room, but that if he [Turner] had any fears, to go ahead and put irons on him."

We need not recite all that occurred. It is sufficient to say that Turner, under Snyder's directions, kept Thomas concealed—a part of the time in irons—until he was clandestinely removed, as hereinafter shown. During this detention he was frequently visited by Snyder, who, by disingenuous and false representations, continued to play upon his excited imagination, and aggravate his unfounded apprehensions, until he consented to part with his beard and don female attire as the best means of escaping his imaginary pursuers. This policy was persisted in until the remittances requested from his uncle and aunt arrived and were satisfactorily divided. Turner then, with Snyder's co-operation, took him to New York city, put him aboard a vessel, and shipped him to Liverpool, England. The job was so adroitly executed as to successfully evade the writ of *habeas corpus*, thwart the object contemplated by the counsel who procured its issuance, and leave Thomas' friends in utter ignorance of his whereabouts, until, by subsequent inquiries, they traced him to his hiding place in England, and undeceived and persuaded him to return and place himself under their guidance and protection.

Upon these facts the rule under consideration requiring the respondent to appear and show cause why he should not be disbarred and stricken from the roll of attorneys of this court was entered. To this rule the respondent has put in an answer. It is prolix and evasive. Instead of confessing or denying the charge that Thomas was manacled, in the manner hereinbefore stated, "with irons," he avers that "Thomas never, at any time, *stated to him* that he had been placed in irons." And in like manner, instead of confessing or denying the facts alleged, tending to establish collusion between Sloop and himself in the procuration of Thomas' release from prison, and his subsequent forcible and clandestine removal to Georgia, he contents himself with the averments that "when he (Thomas) was released from the jail he went away with Sloop and was taken into Georgia," and that "he (Snyder) met them on the way, when Thomas

indorsed a $200 check which he had received, and gave it to him." And to the charge that Thomas had been disguised in female attire, he responds, "I learn that Thomas stated on the trial that I and Mr. Turner *arranged in his presence* to shave him and dress him in female attire," and adds that "this statement is wholly false and untrue."

It is easy to see that his answer in each of the particulars mentioned is and was intended to be evasive. The averment that "Thomas *never stated to him that he had been placed in irons*" is no denial of the charge that he had been so manacled, any more than his answer that Turner and he did not arrange in *Thomas' presence* to shave and dress him in female attire is a denial of the charge that he was so shaved and disguised.

These and other similar evasions, and respondent's failure to deny other and material and damaging imputations contained in the evidence epitomized above, authorize the most unfavorable inferences fairly deducible therefrom. But the court is under no necessity of resorting to inferences in order to reach a just determination of the question involved.

It must be kept in mind that the motive prompting the arrest was the hope of a pecuniary reward, which, it was supposed, had been offered for Thomas' apprehension, assumed by the parties to be $500. The respondent, on several occasions, in terms more or less explicit, suggested that a payment of this amount would conciliate the officers making the arrest, and relax their vigilance, and prepare the way to his discharge. To this suggestion Thomas replied that "he would rather pay the officers the amount of any reward that had been offered than to be compelled to go where he was wanted;" and that, "if possible, he would rather compromise with the officers and have the prosecution quietly withdrawn." Thereupon the respondent proposed "if Thomas could get $500 and give it to him, he would arrange with the officers, and take him out of jail under the appearance of taking him to Missouri, and would, as soon as they got out of Tennessee, release him;" and, acting upon the suggestion, the respondent proceeded, as he admits in his answer, to see Doty, one of the officers, and "told him that he had been employed by Thomas; that he did not think that he (Doty) could recover any reward; and gave him to understand that he would not lose anything if he did *not take too much interest in* holding Thomas."

A further illustration of his methods in the defense of criminals is found in his proposition to unite with Humphries to induce Blount, a stranger in Chattanooga, and a friend of Humphries, "to personate an officer from Missouri, and pretend that he had come for Thomas," and that he would, in aid of the fraudulent suggestion, "get a country justice of the peace to order Thomas turned over to Blount, who could take him away and turn him loose."

These and other facts evince the respondent's groveling conceptions of professional duty, and manifest his unfitness for honorable

practice. He not only undertook, in his professional capacity, by the use of money, to corrupt the officers who made the arrest, and to induce another to personate a Missouri officer in order to effect his client's escape, but offered, in furtherance of his fraudulent suggestion, to personally commit the crime of forgery.

This conduct cannot be adequately characterized. A man capable of such action is unworthy the confidence of the court, and ought not to have his opportunities for wrong-doing enlarged by being permitted to continue to practice as an attorney at law. The respondent will therefore be stricken from the roll of attorneys of this court, and henceforward debarred the right to practice herein.

As to right to disbar attorney, see Ex parte Wall, 2 Sup. Ct. Rep. 569, and In re Wall, 13 Fed. Rep. 814, and note, 820.