## *In re* KEEGAN.

### (*Circuit Court, D. Colorado.* May 14, 1887.)

**1. ATTORNEY—DISBARMENT—FALSE AFFIDAVIT.**

Where an affidavit containing false statements is subscribed to by an attorney at law in a matter of a pre-emption claim filed in a land-office, in which affidavit, however, no formal oath is administered, but which false statements are known by the attorney to be false, such attorney, while he may not be chargeable with perjury, is nevertheless guilty of such unprofessional conduct that his name will be stricken from the roll of the court.

**2. SAME—KNOWLEDGE OF THE LAW—EVIDENCE.**

The claim of such attorney that he did not know the requirements of the land law, or that an oath was necessary, and that he did not read the paper, and signed it innocently, at the request of the land-officer, will not prevail to establish a mistake, if the surrounding circumstances show that he must have understood the matter, and was interested in getting it through.

Proceedings for Disbarment.

*Willard Teller*, *M. Benedict*, and *J. A. Bentley*, committee for prosecution.

*T. D. W. Yonley*, for respondent.

BREWER, J. In 2,061, which is a proceeding in which a committee of the bar have filed charges and specifications against John C. Keegan, an attorney of this bar, alleging such misconduct as they claim compels the court to strike his name from the rolls and to disbar him, there are four charges: *First*, that he was guilty of perjury in swearing to a final pre-emption proof; *second*, that he was guilty of perjury as a witness on the trial of Patrick J. Sheridan, in the district court for this district; *third*, that he was guilty of misconduct in respect to the filing of that pre-emption proof, and in respect to the transactions attending that proof; *fourth*, that it is improper in any person who claims to practice as an attorney at law to advise or draw papers for any person on any matter which a lawyer is supposed to be conversant with, without informing himself of what the law is, and without reading the papers before he allows them to be signed and filed, and that respondent was guilty of such impropriety.

The facts are these: In the forepart of March he went with Mr. Sheridan to the land-office at Del Norte, and filed declaratory statements for Mr. Sheridan and others. On the third day of November the final proofs in the Sheridan case were made. He was a witness for Mr. Sheridan, and the paper is in evidence in which appears his statement, with the jurat of the land-officer. That statement is untrue in this: that the witness states himself to be a resident of Henry, Rio Grande county, when in fact he was a resident of Denver. It is untrue in some other particulars; as, for instance, the amount of improvements actually made. The receiver testifies that that statement was signed and sworn to by Mr. Keegan. Mr. Keegan positively denies this. The register testifies that his impression is that he was present and saw the oath administered. Mr. Sheridan testifies that he was present, and that no oath was administered. Mr. Feely, who was the other witness, testifies that, when he signed, there was no oath administered. On the trial of Mr. Sheridan, Mr. Keegan swore substantially in this respect as he does now. The jury on that trial acquitted the defendant. I assume that, as this is a *quasi* criminal proceeding, this court may, in view of such testimony, conclude, as the jury did, that the charge of perjury is not proved, in that the formalities of the uplifted hand and the administering of the oath did not take place.

It leaves before me the other question, whether, in what unquestionably did take place, the conduct of Mr. Keegan was professional or not. His claim is that he knew nothing, substantially, about the requirements of the land laws; that he did not know that an oath was required; that he did not read this statement; and that thus ignorantly and innocently, at the request of the land-officer, he signed it. Well, whatever we may think of the carefulness or prudence of a man who should thus sign papers, if it were true, as he says, you could hardly

say that that conduct involved such moral turpitude as to justify his removal. But is it true that he was innocent and ignorant? It is not a pleasant thing to say, but my conviction is beyond a doubt that his claim is without the slightest foundation. Of course, in determining the extent of one's knowledge and intent, you are to look at the surrounding circumstances. I may notice some, and yet I shall not attempt to notice the many that impressed themselves upon my mind as the testimony was received. He says that he was ignorant of the land laws; that he went in the first instance with Mr. Sheridan simply as a friend; and yet it appears from his own lips, as well as from abundance of testimony, that immediately after, if not at that time, he was employed as the solicitor for a projected colony, to conduct for them proceedings before the land-office at Del Norte, and that he did act in that capacity. It seems passing strange that any lawyer could proceed upon a transaction of that kind, involving many matters and a variety of proceedings before the department, and never examine the laws applicable thereto. He says that he never examined them carefully until after Mr. Sheridan was arrested, and then he wrote to Secretary Teller and got a copy of the land laws. The testimony of Mr. Brastow and Mr. Cleghorn, the receiver and register, is that, at the very first time he came there, they gave him, and he took away, several of those circulars containing the land laws. He says he believes those were received, but they were lost, and Mr. Sheridan found them long after the final proof was made. It appears, however, that he was there during this time, attending contests before those officers. It appears that he represented himself to many persons as familiar with the land laws. He says that he ascertained the necessity of an oath on the very day and the very hour that this oath was apparently taken. In his testimony given at Pueblo he says that, before he left the office, he picked up one of these blank statements, and noticed that an oath was required, and spoke to Mr. Sheridan about what a curious fellow the officer was that had neglected it. It seems strange that this information should come to him so soon after the time when this oath was apparently taken.

More than that, at the time that he first went down, he filed a declaratory statement in behalf of John Keegan, another in behalf of Thomas Keegan, and many others; indeed, during the month of March he filed some 150 to 200 declaratory statements, nearly all of which were canceled thereafter on the alleged ground of fraud. He testified before the court at Pueblo that John Keegan, in whose behalf this declaratory statement was filed, was not himself; that he was a gentleman living in Denver, a young man, no relative of his, a well-known citizen, who worked at the smelter here for a while, and then, becoming salivated, did outside work; that he unfortunately died between March, when the declaratory statement was filed, and November, when the final proofs were made; and that Thomas Keegan was his brother, and had left the city. He says that Mr. Sheridan may have met this Mr. Keegan at his own office. Mr. Keegan's partner testifies that he never knew such a man as John Keegan other than the respondent. I took pains to look in the directory of 1883 and 1884

and there are no such names as John Keegan and Thomas Keegan; no other Keegan than the respondent. Mr. Bloomfield testifies that when Mr. Keegan was there he frequently spoke of this land upon which this declaratory statement was filed as his own. He told him what he was going to do with it, how he was going to improve it, etc.; and when Bloomfield suggested to him that there was no such occupation, he being a resident of Denver, as would entitle him to make final proof, he told him that there had been a recent decision of the land department that pasturing cattle, with perhaps some fencing, was sufficient to entitle one to prove up on the land. Obviously that was a declaratory statement filed on his own behalf, and his statement that there was some other John Keegan is untrue.

He says that after the first visit to Del Norte there was a scheme to organize an Irish colony there, and that in May or June he went to Chicago and attended a meeting for that purpose, at which 45 persons were present. He says that, after this Irish colony was projected, he prepared many declaratory statements, and sent them to Chicago to be filled out. While he does not distinctly locate the time at which that Irish colony was projected, yet the obvious import of his testimony is that it was not until after Mr. Sheridan had gone back East for his family. The testimony of Mr. Keegan's partner, given under circumstances of much embarrassment, and given with great unwillingness, shows beyond doubt that, early in March, Mr. Keegan was busy in his office with making out land-office papers, and that there were multitudes of them, and that he himself was approached by Mr. Keegan, and two blank statements—that is, unsigned—handed to him, with the suggestion that he sign one and his son the other, and that they thus commence proceedings to obtain title; and when there was some suggestion made as to the difficulties which might interfere with that scheme, as Mr. Northrup was unwilling to leave this city, Mr. Keegan tendered his services as a notary to perfect all that was necessary about making proofs. While there were a few—the exact number I do not recall, perhaps eight or nine—who did go and legally take land, it seems to my mind beyond a doubt that there was a scheme to. go there, and, without regard to the requirements of the land laws of the United States, obtain title to a vast tract of land, and that Mr. Keegan was part and parcel of that scheme, intending to secure for himself his portion of that land.

It does not stand to reason that one entering upon such a scheme as that would close his eyes to the requirements of the law. It would be against human experience that he should say, "I won't look to see what the law requires." On the contrary, his course would be the very reverse; he would carefully study all the requirements of the statute, that he might see how he could get around them. Further than this, singularly enough he appears at Del Norte on the first of November. The records show that he was there conducting a contest in which Mr. Sheridan was interested, though not in respect to this particular tract of land. Singularly enough, he meets Mr. Sheridan, with Mr. Walsh and Mr. Feely, Mr. Feely being the other witness; all go on to Del Norte, and are present

there. He says he did not go for the purpose of assisting in making this proof,—that he went to look after some mining claim; and yet, by some singular conjunction, the parties met. At that time Mr. Sheridan, according to Mr. Keegan's statement, did not want to prove up; was surprised at the suggestion, therefore, that he made to him, intimating that he had undisturbed possession of the land, and that he would rather retain the money requisite for payment for a length of time. Yet Mr. Keegan testifies he was in constant correspondence with Mr. Sheridan; that it was he himself who caused the advertisements to be made of the time for making final proof,—the same time being fixed for final proof for John Keegan and Mr. Sheridan.

In the list of witnesses for Mr. Sheridan, John C. Keegan's name is given; in the list of witnesses for John Keegan, John C. Keegan's name is omitted. He says he furnished the list of witnesses, and yet that he did not know that he would be there. It would seem strange that, if he was carrying on proceedings for John Keegan and Mr. Sheridan, when he gave the list of witnesses for each, he should make a difference in the names. It is strange that, if he had caused this advertisement to be inserted, he should go at the time, and yet without a thought of being a witness; and it is also strange that Mr. Sheridan and the other witnesses should also happen to come at the same time. All these things —and they are but a portion of many which might be mentioned—combine to satisfy me that this was not an innocent and ignorant mistake, and that, while it may be true that the receiver of the land-office did forget to formally administer the oath, it is also true that Mr. Keegan, knowing what was going on,—the very man who was engineering and carrying these things through,—was cognizant of the fact that he was lending his name as a witness to that which was an untruth, and endeavoring by such means to obtain land from the government.

It goes without saying that in our profession the highest obligation is to truth and honesty, and that he who would be a lawyer should by his own conduct, as well as by the advice which he gives to his clients, seek to promote truth and establish justice; and while it is a painful duty to perform, yet I conceive it to be a duty from which no judge can shrink, that whenever the conduct of any member of the bar is challenged, if it appears that that conduct is inconsistent with professional obligations, and is evidence of moral dishonesty, the court should, discharging its duty to the profession and the community, strike that man's name off from the roll of the court; and that will be so ordered here.