Argued March 16; decided April 11, 1898.

## EX PARTE DITCHBURN.

[52 Pac. 694.]

UNPROFESSIONAL CONDUCT BY AN ATTORNEY.*—An attorney who under-
took to procure a necessary undertaking for his client, and himself
subscribed the names of purported sureties to such an undertaking,
and delivered it to a notary public to obtain from the purported sure-
ties the necessary affidavits as to their qualifications, and the latter,
with the knowledge of the attorney, made no attempt to carry out
such instructions, but attached his seal and subscribed his name to the
jurat as if he had sworn them, by means of which a fraud was prac-
ticed upon the court, is guilty of such unprofessional conduct as to
require discipline at the hands of the court.

Application for the disbarment of John Ditchburn,
an attorney of this court.

ORDER OF SUSPENSION.

For the petition there was an oral argument by *Mr.
Lionel R. Webster.*

*Contra,* there was an oral argument by *Mr. John
Ditchburn in pro. per.*

PER CURIAM. This proceeding was instituted by
the state, upon the relation of the attorney-general, to
disbar an attorney for unprofessional conduct. The
information charges that in the year 1892 John Ditch-
burn, a licensed attorney, was retained to prosecute
an appeal from a judgment rendered in the Circuit
Court for Multnomah County against one Molden-
hauer, and, in perfecting the same, executed an under-

*NOTE.— The following are the previous decisions in Oregon on the question
of disbarment: *State ex rel.* v. *Winton,* 11 Or. 456 (50 Am. Rep. 486); *Ex parte Cowing,*
26 Or. 572; *Ex parte Garrigus,* 28 Or. 587; *Ex parte Pilkington,* 28 Or. 587; *Ex parte
Mason,* 29 Or. 18; *Ex parte Tongue,* 29 Or. 49; *Ex parte Kindt,* 32 Or. 474; *Ex parte
Thompson,* 32 Or. 499 (40 L. R. A. 195); *Ex parte Finn,* 32 Or. 519.— REPORTER.

taking therefor to which he fraudulently subscribed
the names of M. H. Duntley and Edward Karsten as
sureties, and in like manner also signed their names
to the affidavit thereon and, as a notary public, ap-
pended his jurat thereto, by which he fraudulently
purported to have administered to each an oath touch-
ing his qualifications as such surety. It is also
charged that in March, 1893, one A. L. Brazee, having
a claim against the steamer Messenger, employed
Ditchburn to collect the same, who thereupon filed in
the United States District Court of the District of Ore-
gon a libel against said steamer, and to an undertak-
ing that the libellant would pay all the costs incident
thereto in case of his default or contumacy, Ditchburn
signed the names of said Duntley and Karsten as
sureties, without their knowledge or consent. Ditch-
burn admits in his answer that he signed the names
of Duntley and Karsten as sureties to said undertak-
ings, but alleges that he had express authority from
said persons to do so, and that after so signing their
names each surety personally appeared before him
and took the oath appended to the undertaking on ap-
peal. Alex. Keegan, a notary public, who had an
office with Ditchburn about five years, being called as
a witness for the latter, testifies that Ditchburn told
him he had signed the names of Duntley and Karsten
to the undertaking for costs in the United States
Court which was delivered to witness, but, not having
time to see these persons, he subscribed his name and
attached his notarial seal to the jurat thereon, by
which it appeared that each surety was duly sworn by
him to the affidavit annexed thereto, stating that he

was a resident of the District of Oregon, that he was a householder therein, and that he was worth the sum of $500 over and above all his debts and liabilities; that the witness and Brazee thereupon took the undertaking to the clerk of the United States District Court, who filed it in his office, and that he did not see the sureties until the next day, at which time he did not have the undertaking with him; that it was the general practice to execute undertakings in this manner, the witness saying: " We used to do that on all bonds. If we were stuck in a hurry in that way, we would just go and put down Mart's (Duntley's name and I would acknowledge it," and that he would attach his jurat showing that the sureties had sworn thereto before him.

Ditchburn testifies that, having authority from Duntley and Karsten to use their names as sureties to undertakings, he subscribed the same to the undertaking for costs in the Brazee case, and thereupon delivered the instrument to Keegan, with instructions to take it to the sureties and obtain their affidavits thereto. He also says that he subscribed these names to the Moldenhauer undertaking, and would have taken the oath showing his authority and their qualifications to become sureties, but that, Keegan being absent, Duntley and Karsten each came into his office, and he commenced to prepare a new undertaking for them to sign, whereupon it was agreed that the undertaking so signed by him was sufficient, and the sureties then took the required oath before him as a notary public; that, exception to the sufficiency of such sureties on this undertaking having been taken, Duntley

and Karsten each appeared before the circuit judge, who examined them as to their qualification, and found that each was a competent surety. The original undertaking in the Moldenhauer appeal being offered in evidence, it appears therefrom that the names of Duntley, Karsten and Ditchburn purport to have been written by different persons. Duntley, who is Ditchburn's brother-in-law, testifies that he had given the latter authority to sign his name to bonds and undertakings in any amount not exceeding $1,000, and that he personally appeared before Ditchburn, and was duly sworn as to his qualifications to become a surety on the Moldenhauer undertaking, and that he and Ditchburn were not then on friendly terms. H. D. Griffin and G. H. Holsapple, city detectives of Portland, appearing as witnesses for the state, testify that Duntley, after inspecting the undertaking in the United States Court, stated to them that he had never authorized anyone to sign his name to any undertaking. Duntley, however, denies this statement. W. T. Hume, a witness for the state, testifies that Ditchburn appeared as a witness in his own behalf before the grand jury of Multnomah County when they were investigating a charge of forgery preferred against him for the part he took in executing the undertaking for costs in the United States District Court, and there testified that he had authority from said sureties to subscribe their names to said instrument, and also stated that if the records of Justice Woods' court were examined they would show forty attachment bonds, more or less, signed in the same manner. Ditchburn not having denied Hume's statement, or that it was

the general custom to execute bonds in the manner indicated by Keegan, there can be no doubt that it was his practice, when occasion demanded speedy action, to subscribe the names of Duntley and Karsten to undertakings; and, while he may have had authority from them so to do, his mode of signing their names so as to make it seem that they had been written by the sureties themselves, who, to all appearances, had subscribed their names in the presence of and been sworn by Keegan as to their qualifications, was undoubtedly intended by Ditchburn, and was well calculated, to deceive his adversary and to mislead the court. True, Duntley and Karsten appeared before the judge and were examined touching their qualifications as sureties in the Moldenhauer undertaking, after exception was taken to their sufficiency, but their appearance for that purpose may have been a ratification of Ditchburn's act in executing the instrument, instead of evidence of a previous authority to subscribe their names to the undertaking.

From the testimony of Griffin and Holsapple it is fairly inferable that if there was any danger of Duntley's being obliged to respond in damages as a consequence of such signature, he would deny all liability, the effect of which would necessarily be to render the undertaking nugatory. The evidence shows that, Brazee being unable to obtain sureties, Ditchburn undertook to procure them for him, and thereupon signed the names of Duntley and Karsten to the undertaking for costs, which he delivered to Keegan, who, well knowing that the sureties had not written their names thereon, and without seeing these per-

sons, subscribed his name and attached his notarial seal to the jurat, by which means a fraud was practised upon the United States District Court; and this presents the question whether Ditchburn had such knowledge of Keegan's act, or participated in the scheme to deceive the judge of said court, to such an extent as to render him amenable to discipline. Unprofessional conduct on the part of an attorney involves a breach of the duty which professional ethics enjoin. It has been held that it may consist in betraying the confidence, taking advantage of or acting in bad faith towards his client; in attempting, by any means, to practice a fraud, impose upon or deceive the court, the adverse party, or his counsel; in introducing testimony which he knows to be false or forged; tampering with or suborning witnesses; fraudulently inducing them to absent themselves from and avoid attendance upon courts when it is suspected or known that their testimony will or may be prejudicial to him or his client; in applying abusive or insulting language to, or assaulting or threatening to chastise, the judge concerning his judicial action; and, in fact, any conduct which tends to bring reproach upon the legal profession, or to alienate the favorable opinion which the public should entertain concerning it: *In re Snyder,* 24 Fed. 910; *In re Keegan,* 31 Fed. 129; *In re Serfass,* 116 Pa. St. 455 (9 Atl. 674); *People* v. *Spencer,* 61 Cal. 128; *In re Burris,* 101 Cal. 624 (36 Pac. 101); *Penobscot Bar* v. *Kimball,* 64 Me. 140; *Beene* v. *State,* 22 Ark. 149; *State* v. *Kirke,* 12 Fla. 278 (95 Am. Dec. 314); *People* v. *Green,* 7 Colo. 237 (49 Am. Rep. 351, 3 Pac. 65, 374); *Burns* v. *Allen,* 15 R. I. 32

(2 Am. St. Rep. 844, 23 Atl. 35); *In re Philbrook*, 105
Cal. 471 (45 Am. St. Rep. 59, 38 Pac. 511, 884); *Rice*
v. *Commonwealth*, 18 B. Mon. 472; *Bar Association* v.
*Greenhood*, 168 Mass. 169 (46 N. E. 568).

In the case of *Re Arctander*, 26 Minn. 25 (1 N. W.
43), an attorney was suspended for a period of six
months for antedating an oath of office administered
by him as a notary public to a person who had been
elected a justice of the peace, and also antedating the
jurat of the sureties to the official undertaking of such
justice so as to make it appear that he was qualified to
try a criminal action on a change of venue at the time
the cause was transferred to him.   In the case of *Re
Hirst*, 9 Phila. 216, certain parties being unable to
procure bail in an action of replevin, applied to Hirst,
who, as their attorney, undertook to obtain the neces-
sary sureties, but, instead of giving the matter his
personal attention, he employed one Ingersoll, who
procured two persons who were wholly irresponsible
to sign the bond and appear and take the required
oath before the judge, who accepted them as sureties,
Hirst paying them $10 for their time, risk and trouble.
Upon a discovery of the fraud, Hirst was cited to show
cause why he should not be disbarred.   At the trial
of the charge it was proven to the satisfaction of the
court that Hirst had no knowledge of the fraudulent
nature of the transaction, notwithstanding which he
was suspended for a period of 68 days on account of
his negligence in turning the matter over to Ingersoll,
and accepting, without inquiry, what the latter did.
The court, in deciding the case, makes use of the fol-

lowing language: "An attorney is not responsible for the character of the bail presented by his client, unless there is some fact or circumstance which should rouse suspicion or put him on inquiry. . If nothing appears to the contrary, he may take it for granted that the principal is honest, and that the sureties do not intend to commit perjury. But an attorney who undertakes to procure bail not only assumes the responsibility that a party is under when acting for himself, but should act with more circumspection in view of his duty to the court. He cannot get rid of this obligation by employing a subordinate, and then closing his eyes to what the latter does."

In the case at bar, Ditchburn undertook to obtain for Brazee the necessary sureties, and, after subscribing the names of Duntley and Karsten to the undertaking for costs, delivered it, as he says, to Keegan, to take it to and obtain from the purported sureties the necessary affidavits as to their qualifications, but Keegan, making no attempt to carry out these instructions, attached his seal and subscribed his name to the jurat as if he had sworn them, by means of which a fraud was practiced upon the United States district court; and, in any event, Ditchburn would be amenable for his carelessness if he had no knowledge of Keegan's acts, but if he was aware of the means adopted by the latter, and made no effort to correct it, he is guilty of unprofessional conduct. An examination of all the evidence tends to convince us that he was aware of, if not a party to, the scheme; and, such being the case, it is ordered that he be suspended

from the practice of his profession for the term of six months, and that the state recover from him the costs and disbursements of this proceeding.

SENTENCE OF SUSPENSION.

Decided March 14; rehearing denied June 20, 1898.