THE PEOPLE *ex rel.* Deneen, State's Attorney,

*v.*

CHARLES PICKLER.

*Opinion filed June 21, 1900.*

1. ATTORNEYS AT LAW—*presenting worthless appeal bonds is ground for disbarment.* A lawyer who induces the court to allow appeals by presenting appeal bonds with sureties whom he knows to be worthless or fictitious persons, practices a fraud upon the court, and is guilty of such misconduct as warrants his disbarment.

2. The court reviews the evidence in this case at length, and holds it sufficient to establish that the respondent has filed appeal bonds which he knew to be worthless and has presented false and forged affidavits to the court in suits in which he was employed, and orders the name of the respondent to be stricken from the roll of attorneys.

ORIGINAL information for disbarment.

This is an information, filed in this court by Charles S. Deneen, State's attorney for Cook county, in behalf of the People of the State upon the relation of the grievance committee of the bar association of Chicago against the respondent, Charles Pickler, an attorney and counselor at law, licensed as such under the rules of this court and the law of the State, charging the said Pickler with unprofessional, dishonorable and scandalous conduct, calculated to bring the courts of justice into disrepute and contempt and to tarnish the good name of the legal profession, and asking that the license of the said Pickler be revoked and his name stricken from the rolls of the Supreme Court, and that he no longer be permitted to occupy or exercise the office of attorney and counselor at law in the State. The information is signed by the State's attorney of Cook county and by five members of the bar of Chicago, constituting the grievance committee above named. The respondent, Pickler, has filed a sworn answer denying the charges set up against him in the information. By an order of this court, George M. Stevens

was appointed referee with direction to take testimony in relation to the matters involved, and to report the same to this court. The testimony has been so taken and returned, and an abstract thereof has been made; and the same is submitted to us for our consideration.

CHARLES S. DENEEN, State's Attorney, (EDWIN M. ASHCRAFT, FRANK ASBURY JOHNSON, and L. D. CONDEE, of counsel,) for the relator.

JAMES E. PURNELL, for the respondent.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

*First*—It is charged in the information, that the respondent, Charles Pickler, who was licensed by this court on October 22, 1894, as an attorney and counselor at law, has been guilty of filing in the several courts of Cook county false, fictitious, forged and worthless appeal bonds in sundry and divers suits and actions.

There can be no doubt, that it is professional misconduct in a lawyer to perfect appeals on worthless or straw bonds. When a lawyer induces a court to enter an order, allowing an appeal, by presenting an appeal bond with sureties, whom he knows to be worthless or fictitious persons, he practices a fraud upon the court. Unprofessional conduct on the part of an attorney involves a breach of the duty which professional ethics enjoin, and such a breach of duty may consist "in attempting by any means to practice a fraud, impose upon, or deceive the court." (*Ex parte Ditchburn*, 52 Pac. Rep. 694; 32 Ore. 538). An attorney is liable to disbarment "for obtaining a rule or order on false, equivocal or groundless suggestions." (Weeks on Attorneys and Counselors,—2d ed.—p. 170; *Clarke* v. *Gorman*, 3 Taunt. 492; *Rolfe* v. *Rogers*, 4 id. 191).

The record is voluminous, and contains, besides a large mass of testimony, nearly one hundred appeal bonds filed within a period of about two years by the respond-

186—5

ent. It is impossible for us, within the compass of an opinion, to state in full all the facts with reference to the various transactions appearing in the record. We can do nothing more than allude to a portion of the evidence. Respondent in 1892 was at Jacksonville, Florida, there engaged in some capacity with the Standard Oil Company part of the time, and with some railroad company a part of the time. In the summer of 1892, he organized a World's Fair Tourist Company, and devoted much time to advertising and canvassing for it. Associated with him in this enterprise at Jacksonville was one Harry I. Greene, a stenographer who acted there as a court reporter. In 1893 respondent came to Chicago on business connected with this tourist company, and became associated with a company known as the Columbian Union of Hotels. Shortly thereafter and in 1894, Greene came to Chicago from Florida. Pickler located near the World's Fair grounds on Sixty-third street. In his Columbian Union of Hotels, of which he was the general manager, he was associated with Gay Dorn and his wife, Charlotte E. Dorn, and David E. Towne and one William Hough. In October, 1894, the respondent, after an extended trip to the south and west, returned to Chicago, and in that month was admitted to the bar. He took up his residence at 226 East Sixty-third street, at what is known as the Coliseum Hotel, one of the hotels operated by him and his associates during the World's Fair. He had an office in some part of this hotel from that time up to the time of filing this information. At this hotel he was thrown into contact with certain parties, named C. C. Gibson, George A. Loughridge and David D. Branaman; at this hotel also Greene boarded. All the parties thus named figure prominently in the matter of the appeal bonds hereinafter referred to. Greene was a man of no pecuniary responsibility, and was in the habit of borrowing small sums of money from parties, by whom he was employed, to pay for his meals and daily expenses.

Gay Dorn and his wife constituted the members of a real estate firm, known as C. E. Dorn & Co. This firm appears to have had its office with the respondent at the Coliseum Hotel, 226 East Sixty-third street, or in the building of which the hotel was a part. The respondent, Pickler, had other offices in the business part of the city of Chicago at various times; at the Marquette Building, at 70 LaSalle street, at 95 Clark street, and in the Unity Building, and in the Opera House Building. Respondent was also connected with what was called the Original Real Estate Auction Company, 70 LaSalle street. The evidence shows, that the chief business of Dorn and the Original Real Estate Auction Company, and of those connected therewith, was to purchase equities of redemption in improved property, which was subject to mortgage, where the owners of such equities were unable to resist foreclosure against their property or to retain possession on account of the encumbrances. The plan seems to have been to induce these owners to convey the encumbered property to some person selected by Pickler or his associates, and take back from such person a second mortgage supposed to represent the value of the equity, the purchaser agreeing to pay off the encumbrance, and thereby make what theretofore had been a second mortgage a first mortgage upon the property. In these cases, the purchaser was represented to be a man of means and able to pay off the encumbrance, but the possession of the property was always delivered to the purchaser, who collected the rents. The evidence shows that, in very many of these cases, the equities were transferred to parties, real or fictitious, selected by the respondent, and that the respondent thereafter received the rents. None of the mortgages were ever paid off in cases of the purchases of these equities, nor was any cash ever paid on account of such purchases; notes secured by a second mortgage were given, and these notes, or second mortgages, were never paid.

The parties, selected to hold these equities, were mainly Branaman, Gibson, Greene, Loughridge, and David E. Towne, and one Edward P. Lester, though the evidence tends very conclusively to show that Lester was a fictitious person. Loughridge was for a time a clerk at the Coliseum Hotel and an art student, but is not shown to be a person of any financial ability. He refuses to answer all questions in relation to the property which was transferred to him, or in reference to his interest therein. Branaman was a young man who came to Chicago from Moultrie county. He had read law at Valparaiso, Indiana, and had there studied shorthand and typewriting, but was not admitted to the bar in Illinois. He seems to have come to Chicago in 1896, and was employed by Dorn and Pickler at their office in the Coliseum Hotel to do typewriting and reporting for them, receiving a salary for a part of the time of five dollars a week, and for part of the time of two dollars per week, and board and car fare, and a part of the time eight dollars a week. The record shows that he was a man of no property whatever, and held the title to none, except such as was conveyed to him by Pickler, or at the instance of Pickler. Branaman states that, at the request of Pickler, he consented to hold the equities for Pickler and those associated with him in the Original Real Estate Auction Company. Branaman was at the office of that company at 70 La Salle street in Chicago and refers to a few of the equities which were transferred to him. Branaman says that the deeds were made to him of encumbered property, and he signed notes and trust deeds, or mortgages, for the equities at Pickler's request; but that upon this property nothing was ever paid. Sometimes he was introduced to the parties making these conveyances by Pickler, but did not know them, nor anything about the transfers except what Pickler told him. When Branaman conveyed away the property in cases where he held the title thereto, he knew nothing about

the parties to whom such property was conveyed, but made the conveyances under the direction of Pickler. Gibson was wholly irresponsible, and had no property except what was conveyed to him in the manner above stated; was a dry goods clerk, part of the time out of employment and looking for a job, and part of the time engaged, as one of the witnesses says, in "wrecking World's Fair buildings, or purchasing materials in World's Fair buildings."

Gay Dorn owned a vacant lot in Chicago between Seventy-second and Seventy-third streets, described as lot 19, etc. The testimony shows, that this lot 19 was worth about $2000.00, though some of the witnesses put the value at a little more than $2000.00. On July 5, 1892, Dorn placed a mortgage upon this lot for $2000.00 on which he never paid anything, either principal or interest; and no taxes were paid on the lot after the making of the mortgage. On August 20, 1894, Dorn conveyed this lot to the respondent, Pickler, the latter assuming the payment of the mortgage. On May 6, 1895, Pickler conveyed lot 19 to Charles C. Gibson, the person above named, whose address seems never to have been discovered by the parties interested in finding it; but the deed to Gibson was not recorded until July 16, 1895. On June 24, 1895, Pickler was the attorney for Dorn in a certain case before a justice of the peace, wherein one Stephens recovered a judgment against Dorn, and Dorn prayed an appeal therefrom to the circuit court of Cook county. The appeal bond was signed by Charlotte E. Dorn, as principal, and Charles C. Gibson, as surety. On the back of this appeal bond, which was filed in the circuit court by Pickler, is an affidavit signed by Gibson and sworn to before Pickler as a notary public, wherein Gibson swears that he is worth over and above all his just liabilities the sum of $2500.00, and that he is the owner of said lot 19 of the value of $6500.00, encumbered for $4000.00. When Gibson swore to that affidavit—if he did swear to it—he

not only was not worth $2500.00, but was not worth one cent, and the property which is therein sworn to be worth $6500.00 was not worth more than $2000.00. The falsity of this affidavit must have been known to the respondent, Pickler, because he had himself only a short time theretofore conveyed this lot to Gibson, and knew its value, and knew the amount of encumbrance upon it, and knew the pecuniary standing of Gibson, who is not shown to have paid a single cent for the lot, and to have merely taken the title at the request of Pickler.

On October 9, 1895, Gibson, by a deed dated and acknowledged on October 9, 1895, conveyed lot 19 back to the respondent, Charles Pickler, but this deed was not recorded until March 18, 1896. In the meantime, in a suit brought by Harry B. Orr against Charles Pickler before a justice of the peace, wherein judgment was rendered against Pickler, Pickler upon October 26, 1895, filed an appeal bond in the circuit court of Cook county, signed by himself as principal and Charles C. Gibson as surety. Upon the back of this appeal bond is an affidavit, purporting to be signed by Charles C. Gibson and to be sworn to before Charles Pickler as notary public on October 26, 1895, in which Gibson swears that he is worth over and above all his just liabilities the sum of $2500.00, and that he is the owner of said lot 19. The respondent must have known, when he administered the oath to Gibson, that the affidavit, which Gibson was swearing to before him, was false, not only in the statement therein made that Gibson was worth $2500.00, but also in the statement that Gibson was the owner of lot 19; for, at that time, Gibson did not hold the title to lot 19, but, on the contrary, had conveyed that title to Pickler himself seventeen days theretofore, to-wit: on October 9, 1895. There can be no doubt that the respondent imposed upon the court, and intended to impose upon the court, by creating the belief that Gibson was a responsible party and owned lot 19, when he was not responsible and did not

own lot 19. Would any honorable lawyer, acting as a notary public, administer an oath to a surety that the latter owned a piece of property, when, as a matter of fact, the lawyer himself owned it, and then present and file and use such bond in order to secure an appeal from a judgment against himself?

On December 24, 1895, in the case of *Fuchs & Lang Manf. Co.* v. *Gay Dorn*, the respondent, Charles Pickler, filed an appeal bond signed by Gay Dorn as principal and C. C. Gibson as surety, on the back of which bond is an affidavit, signed by C. C. Gibson and sworn to before Charles Pickler as notary public on December 24, 1895, wherein Gibson swears that he is worth over and above all his just liabilities the sum of $4000.00, and that he is the owner in fee simple of said lot 19. When the respondent filed this appeal bond, he knew that it was worthless so far as the surety was concerned, and he knew that the affidavit made upon the back of it was false, because, although on December 24, 1895, the date of the affidavit, the title to lot 19 appeared of record in Gibson, inasmuch as the deed from Gibson to the respondent was not recorded until March 18, 1896, yet, as matter of fact, the title to the lot was in the respondent, and had been ever since October 9, 1895, when Gibson conveyed it to the respondent. By this conduct, Gibson was presented to the court, not only as a man who was pecuniarily responsible, but as the man who owned lot 19; the court thereby was deceived and imposed upon. Whether or not the respondent was afraid to trust Gibson with the title, and for that reason had it conveyed back to himself on October 9, 1895, does not appear, but the fact that the deed from Gibson to himself was withheld from the record during the period when these appeal bonds were executed, indicates very clearly that the showing made by the record was permitted to exist for the purpose of deceiving the court and the parties interested as to the ownership of the lot.

Again, on February 29, 1896, in the case of *Jackson* v. *Hulze*, the respondent, Pickler, filed an appeal bond as the attorney of Hulze, signed by Frank Hulze as principal and C. C. Gibson as surety; and upon the back of the appeal bond is an affidavit signed by C. C. Gibson and sworn to on February 29, 1896, before Charles Pickler as notary public, in which Gibson swears that he is worth over and above all his just liabilities $4000.00, and that he is the owner in fee simple of lot 19. At that time the statements in this affidavit were false and known to be false by the respondent who administered the oath to affiant. The surety upon the bond signed by Hulze was worthless, and was known to respondent to be worthless.

Again, on January 18, 1896, in the case of *Chicago Street Indicator and Advertising Co.* v. *Gay Dorn and Charlotte E. Dorn*, the respondent presented and filed an appeal bond, signed by Gay Dorn and Charlotte E. Dorn as principals and by C. C. Gibson as surety, upon the back of which is an affidavit signed by C. C. Gibson and sworn to before Charles Pickler as notary public on January 18, 1896, in which Gibson swears that he is worth, over and above all his liabilities, over $4000.00, and that he is the owner in fee simple of said lot 19; and that the same is worth $4000.00 over and above any encumbrances thereon; this affidavit was false and was known by the respondent to be false not only as to the value of lot 19, but as to its ownership.

Again, on March 18, 1896, in the case of *Palmer* v. *Keck*, the respondent, Pickler, filed an appeal bond signed by William T. Keck as principal and C. C. Gibson as surety, dated March 18, 1896, upon the back of which bond is an affidavit of Gibson, the surety, sworn to on that date before Charles Pickler as notary public, wherein Gibson swears that he is worth over and above all his just liabilities the sum of $5000.00, and that he is the owner of said lot in fee simple, and that the same is worth $4000.00 over and above all encumbrances. This affidavit was also false and was known to be false by the respondent,

Pickler; but it further appears that on the very day, to-wit: March 18, 1896, upon which this bond was taken and approved, the deed which had been made by Gibson to Pickler on October 9, 1895, was recorded, and on the same day a deed was executed and acknowledged by Charles Pickler to Harry I. Greene, conveying said lot 19. This deed from Pickler to Greene, though executed and acknowledged on March 18, 1896, was not recorded until July 17, 1896; and yet, on April 23, 1896, in the case of *Clancey* v. *Charlotte E. and Gay Dorn*, the respondent filed an appeal bond for the Dorns, signed by them as principals and by himself as surety, and procured the approval of said bond by a judge of the circuit court; and upon the back of that bond appears an affidavit signed by the respondent, Charles Pickler, and sworn to before the clerk of the court on April 22, 1896, in which the respondent swears that he is the owner in fee simple of said lot 19, and that the same is worth $6500.00 and is mortgaged for $2000.00. Can there be any doubt that the affidavit thus sworn to by the respondent was false and made for the purpose of making the circuit court approve of the bond? Not only was the lot not worth $6500.00, but respondent was not then the owner of it, inasmuch as by a deed, dated and acknowledged theretofore on March 18, 1896, respondent had conveyed the lot to Harry I. Greene.

The deed, executed by the respondent to Harry I. Greene, was recorded on July 17, 1896, and between the latter date and October 27, 1896, the respondent, Pickler, filed twelve appeal bonds in each of twelve cases, and each of these appeal bonds was signed by Greene as surety. On the back of each of these bonds is an affidavit by Greene, swearing that he is the owner of said lot 19, and that the same is worth $7000.00 and encumbered for $2000.00. In one of these affidavits Greene swears, that he is worth $10,000.00 above all liabilities, and in other of the affidavits he swears that he is worth $5000.00 over and above all liabilities. Many of these affidavits pur-

ported to have been sworn to before a notary, named William J. Lee, but parties, interested in the cases in question, testify that no such man has been found, or can be found. Gibson cannot be found, and Greene is irresponsible, and it does not appear that he ever owned any property, except in cases where he held the title for the respondent, and at the respondent's request.

One of the cases, in which Greene signed an appeal bond as surety, is the case of *Sprague* v. *Dorn.* Mr. Levi Sprague, who was the attorney for the plaintiff in said suit and who obtained a judgment against Dorn, tried to find Greene, the surety on the bond, and went to see the respondent, Pickler, in reference to Greene, as respondent was the attorney in the case for the defendant, Dorn. Sprague swears that he was unable to find Greene, the surety, or to find the notary, William J. Lee, who had taken the oath of the surety as endorsed upon the bond. He swears that, when he went to see the respondent, the respondent denied knowing anything about Greene, but finally admitted that he did know him, and yet refused to give Sprague any information.

Another lot, known as lot 27 in block 2, Greenwood Heights subdivision, was made to serve the same purpose as lot 19 already mentioned. Lot 27, having a frontage of twenty-five feet, and a depth of one hundred and twenty-five feet, is located in the open prairie about fifteen miles from Chicago. The testimony shows, that it is not worth more than $10.00 or $12.00; the land, of which it is a part, is worth from $120.00 to $125.00 per acre as farming land. Block 2, of which it is a part, and block 1 adjoining are encumbered for $8600.00, being an amount largely in excess of their real value. The title to this lot was conveyed to one James F. Preston, who was connected with the Original Real Estate Auction Company. On December 2, 1896, the day, upon which the deed was made to Preston, the respondent, Pickler, filed an appeal bond in the case of *Duffin for use, etc.* v. *Northwestern Nat.*

*Bank*, with Preston as surety thereon, and on the same day, to-wit: December 2, 1896, Preston conveyed said lot 27 to David D. Branaman above mentioned. This deed purports to have been acknowledged on December 2, 1896, before William J. Lee, and was recorded on December 7, 1896. Thereafter, between January 16, 1897, and February 25, 1898, the respondent, Pickler, filed appeal bonds in five cases, with Branaman as surety on each of said bonds. Upon each of these bonds is an affidavit, purporting to be signed by Branaman, stating that he was the owner of this lot 27, that it was unencumbered, that it was worth from $800.00 to $850.00, and also stated that he, Branaman, was worth $1000.00 above all liabilities. At the time when these affidavits were made, the lot was not worth from $800.00 to $850.00, but was only worth $10.00 or $12.00 as above stated; and Branaman was not worth $1000.00 above all liabilities, but was in the employ of Dorn and Pickler at a few dollars per week, besides being furnished by them with his board and a.room. The falsity of these affidavits must have been known to the respondent, Pickler, when he presented the appeal bonds with Branaman as surety thereon, because the respondent knew that Branaman was pecuniarily irresponsible, and also knew the value of the lot, he having caused the lot to be conveyed to Branaman. Branaman, however, whose testimony is in the record, swears that, as to three of these bonds, he did not sign them, and that the signatures thereto, purporting to be his signatures, were not really his signatures; and, as to William J. Lee, before whom, as a notary public, the affidavits, endorsed upon the bonds, appear to have been sworn to by Branaman, Branaman says that he does not know and never saw William J. Lee, and that he never went before any such man to sign or acknowledge any papers. The writing in the body of four of these bonds, and in the affidavits endorsed thereon, are proven to be in Pickler's handwriting.

On February 26, 1898, the next day after the execution, or the purported execution, of the last bond signed by Branaman as surety, Branaman made a deed of lot 27 to Edward P. Lester. This deed was acknowledged on February 26, 1898, by Branaman before Gay Dorn as notary public, and was recorded on March 23, 1898. The deed was so executed by Branaman to Lester at the request of the respondent, Pickler. Branaman swears that he never had any beneficial interest in lot 27 of any kind or description, and that he simply signed the deed because Pickler requested him to do so. Branaman furthermore swears that he never knew anybody, named Edward P. Lester, while he was working for Pickler or at any other time; that he simply heard Pickler use Mr. Lester's name in connection with some property. After the deed was executed by Branaman to Lester, between April 28, 1898, and September 29, 1898, in twenty-two different cases the respondent, Pickler, filed twenty-two appeal bonds, each of which purported to be signed by E. P. Lester as surety. On each of these bonds is an affidavit purporting to be sworn to by Edward P. Lester or by Gay Dorn, his attorney in fact, swearing that Lester is the owner of said lot 27, and that the same is free from encumbrances and worth from $800.00 to $850.00. In some of these affidavits Lester is made to swear that he is worth $5000.00 above all liabilities, and in others that he is worth $10,000.00 above all liabilities. We are satisfied from the evidence that all these bonds, which were signed by Lester were worthless, and that they were known to be worthless by the respondent, Pickler, when he presented them.

The evidence tends very strongly to show that Lester was a fictitious person, and that no such man ever really existed. The affidavits on some of the bonds, purporting to have been signed by Edward P. Lester, appear to have been sworn to before one Oscar S. Drake, a notary public. Drake, whose testimony is in the record, stated that he did not know Lester, but the respondent, Pickler,

introduced a man to him as Edward P. Lester, and, "when he swore a man to an affidavit for Pickler, Pickler generally introduced to him the party who made the affidavit." In the case of *Holm* v. *Lewis*, on June 15, 1898, Pickler filed an appeal bond with Lester as surety, scheduling said lot as worth from $800.00 to $850.00, and as unencumbered. The attorney for Holm, the plaintiff in that case, filed an affidavit, and asked to have Pickler attached for contempt for filing the appeal bond signed by Lester as surety, stating that he had used every means to find Lester, and had failed. The order was obtained requiring Pickler to answer certain interrogatories. He admits that he asked Lester to sign the bond, but is unable to state who was present at the time. In his answer and in his testimony he makes many contradictory statements in regard to the man, Lester. At one time he says that he has never resided at the same place with Lester; and at another he says that Lester has constantly resided at 226 East Sixty-third street, and resided there at the time of giving his answer, to-wit: on December 29, 1898. In October, 1898, he told an attorney for the plaintiff in one of the suits, in which an appeal bond had been filed with Lester as surety thereon, that Lester was in Europe. He told another attorney, interested in a similar suit, that Lester was a non-resident, and was in New York. He told still another attorney that Lester was a broker on the board of trade, and resided somewhere in Chicago, but that he did not know where he could be found. He told still another person that Lester was a real estate man. At least three persons, who resided at 226 East Sixty-third street, or the Coliseum Hotel, swore that they never saw any such man as Lester there, and never knew any such man. At another time respondent stated in one of the circuit courts of Cook county in 1898, that Lester was on his way from New York to Cuba. At another time the respondent swears that Lester was in the northern part of Mexico. He is unable, however,

to give his post-office address, and, while claiming that he has received letters from Lester, declines to produce the same.

A power of attorney is produced, purporting to have been executed by Edward P. Lester on September 6, 1898, and acknowledged before Pickler as notary public, and authorizing Gay Dorn, as attorney in fact, to sell or mortgage "my real estate, personal property or mixed property; to purchase for me and in my name for cash or in exchange for my real, personal or mixed property, any real, personal or mixed property; to borrow money by pledging as security any of my real, personal or mixed property; to sign any kind of an indemnifying or security bond; to do any act or thing to bind me which in his discretion he may determine to be expedient."

On May 8, 1897, Charlotte E. Dorn and Gay Dorn conveyed the Coliseum Hotel property to one George A. Loughridge. This deed, though dated May 8, 1897, was not acknowledged until June 12, 1897. The acknowledgment was taken before the respondent, Pickler, as notary public. At this time the property was encumbered by two trust deeds, one for $20,000.00 and the other for $6000.00. On May 13, 1897, Pickler filed in the case of *Van Vlissingen* v. *Dorn*, an appeal bond with Charlotte E. Dorn as surety, in which Charlotte E. Dorn swears that she is the owner of the property, and that it is worth $70,000.00 and encumbered for $20,000.00. This affidavit of Charlotte E. Dorn was sworn to before Charles Pickler as notary public on May 10, 1897. On June 11, 1897, Pickler filed an appeal bond in the case of *Ross* v. *Dorn*, with Charlotte E. Dorn as surety thereon, and on the back of which bond was an affidavit purporting to be signed by Charlotte E. Dorn and sworn to before Charles Pickler as notary public, in which Mrs. Dorn swears that she is the owner of the Coliseum Hotel, that it is worth $70,000.00 and encumbered for $20,000.00. After making this affidavit on June 11, before Pickler, Mrs. Dorn on the next day, June 12,

1896, acknowledged the deed conveying the property away to Loughridge. Thereafter, Pickler filed three appeal bonds in three different cases with Loughridge as surety. As has already been stated Loughridge was a clerk in the Coliseum Hotel, and a man of no pecuniary responsibility.

On October 20, 1898, in the case of *Cleverly for use* v. *E. J. Fay*, the respondent caused an appeal bond to be filed signed by Mrs. E. J. Fay by Charles Pickler, attorney in fact, as principal, and by one H. W. Harwood as surety. Upon the back of this bond is an affidavit purporting to be signed by H. W. Harwood and to be sworn to before Oscar S. Drake, in which Harwood swears that he is worth $20,000.00 above liabilities, and owns the property set forth in the affidavit, and worth $3900.00. The property, which Harwood swears that he owns, is described in his affidavit as lots 1 to 19 in Oakland sub-division, section 14, township 39, range 14. The testimony shows that, if any such property exists, it is some distance in Lake Michigan due east of the Auditorium Hotel. Only one H. W. Harwood can be found in Chicago. He testified in this case that he never signed the appeal bond in question, and that he does not know and never knew the respondent, Charles Pickler. He also swears that he does not know Oscar Drake, the notary before whom the affidavit on the appeal bond purports to have been sworn to. An expert witness placed upon the stand, who is acquainted with the handwriting of the respondent, and who says that he has seen the respondent write often, swears that the signature of H. W. Harwood to the appeal bond last referred to, is in the handwriting of the respondent, Charles Pickler. The respondent, in attempting to explain this Harwood matter, gives testimony which is contradictory and confusing in its character. In a contempt proceeding, instituted against the respondent in one of the circuit courts of Cook county, where a rule was entered against him to produce Har-

wood in court, he says he tried his best to find Harwood, but failed to do so. Drake, the notary before whom the affidavit of Harwood purports to have been made, swears that he did not know Harwood, nor where he lived; that Mr. Pickler introduced him to him (Drake), and so he took his affidavit. Drake appears to have been connected with the Original Real Estate Auction Company. Respondent says in his testimony, that he does not know where Harwood is and never did know; that he met him at 70 LaSalle street, and asked him to do a little "Good Samaritan" work. He says that he asked Harwood for his description of his real estate, and wrote the description which he gave him in the affidavit, and told him to go before Mr. Drake and swear to the affidavit.

On May 4, 1896, the respondent, Pickler, filed in the circuit court of Cook county, in the case of *Karpen* v. *Katzman*, an appeal bond purporting to be signed by one W. D. Hammond as surety, upon the back of which is an affidavit purporting to be made by Hammond and sworn to before Charles Pickler on May 4, 1896, in which Hammond swears that he is worth $10,000.00, and owns in fee simple lot 1, block 16, Dryer's subdivision of the southeast quarter, section 10, township 38, range 15 east, worth $3000.00. The testimony shows that this land is about four miles from the shore in Lake Michigan. No such man as W. D. Hammond can be found. Katzman, the principal in the bond, says that Pickler was his attorney, and that Pickler told him that he had a man to sign the bond. Katzman says: "I guess I seen him a couple of times there; I don't recollect; he was sitting there in the office; he had no desk; I just met Hammond there; I heard he wanted to sign my bond; Pickler asked him to sign the bond; Pickler said that I needed a bondsman, and he said * * * 'I got a man there to sign the bond;' said he would get a man to sign the bond; this was on the street; we went to his office; when we went to his office, the papers were made out, and when we came down

there was a man there who signed it;  *  *  *  I had never seen W. D. Hammond before that time;  *  *  *  I never saw Hammond after that; I did not ask him where he lived, and do not know where he lives now." The respondent says that he had a speaking acquaintance with Hammond, and asked him to sign the bond, but knew nothing about the property; but cannot say where he first met Hammond, and cannot remember a single place where he ever saw him. He furthermore says that he never tried to find Hammond until after the information was filed, and never knew anybody who knew him.

On November 23, 1898, in the case of *Porter* v. *Brand*, the respondent, Pickler, filed in the office of the clerk of the circuit court of Cook county an appeal bond purporting to be signed by one Harry B. Manning, scheduling lots 1 to 14 inclusive in block 1, canal trustees' subdivision. Upon the back of the appeal bond is an affidavit purporting to be signed by Manning and sworn to before Oscar S. Drake, as notary public, wherein Manning swears that he is worth $5000.00 and owns said lots, unencumbered and worth $17,000.00. The lots in question were never owned by Harry B. Manning. The attorney for Porter, the plaintiff in the case, filed an affidavit and asked that the respondent, Pickler, be attached for contempt of court for filing the bond, and filed interrogatories, under a rule, to be answered by Pickler. In reply to these interrogatories, the respondent says that he perfected the appeal; that he procured Manning to sign the bond; that he had a speaking acquaintance with him; that he does not recollect the first place he met him; that he does not know his place of business; that the last time he saw him was the day he signed the bond; that he does not know where he can be found. Mr. Menkin, attorney for Porter, swears that he made every effort to find the surety, Manning, and failed to learn from anybody that any such man existed. Menkin says that he saw Drake, the notary before whom Manning's affidavit was made,

and also saw Carrie Brand, the defendant in the suit, in whose behalf the appeal bond was filed, but that neither of them knew anything about Manning. Drake in his testimony says that the man, Manning, was introduced to him, he supposes, by Mr. Pickler, but that he never heard of him before that day, and has never seen him since, and never knew where he lived.

We forbear to make any comments upon the facts above recited. We are of the opinion that the respondent has been guilty of the first charge made against him in the information, that is to say, of filing in the courts of record in Cook county false, fictitious, forged and worthless appeal bonds in suits therein pending.

*Second*—The second charge made against the respondent is that he was guilty of fraud and deception, and of presenting to the court false and forged affidavits, in a certain case pending in the superior court of Cook county, entitled *W. B. Scace & Co.* v. *Richard Curran.* The nature of this charge can be best understood by a statement of the facts.

Some time in the summer of 1896, a suit was brought by W. B. Scace & Co. against Richard Curran. Curran was served with summons upon August 14, 1896. Shortly after being served, he went to the office of the respondent, Pickler, to employ him to enter an appearance for him in the case. Pickler was then absent from the city. The suit was brought upon a promissory note and an account. When Curran went to the office of Pickler, he found David D. Branaman there, and told him, as Pickler was absent, to enter his appearance in that case. Curran says that he had no defense to the suit, and that he executed the note, but that he was then negotiating a loan of money, and wanted a little time in order to get the loan closed up, intending then to pay the amount involved in the suit. Branaman says, that he at once wrote to Pickler what Curran had said to him, but that Pickler did not answer the letter. Default was taken and judg-

ment entered in the case for want of a plea on September 10, 1896.

An entry of the appearance of Richard Curran and of the appearance of D. D. Branaman as attorney, dated September 11, 1896, was filed in the cause on September 12, 1896. The body of the entry of appearance and the date were in type-written letters; the signature of D. D. Branaman is in writing. A plea of the general issue and a further plea, denying the execution of the note, were prepared and purport to be signed by D. D. Branaman as attorney. Attached to this plea is an affidavit of merits, purporting to be signed by Richard Curran, in which he makes oath that he verily believes that he has a good defense to the whole of plaintiff's demand, and that the plea is true in substance and in fact. The affidavit attached to this plea purports to be sworn to before Gay Dorn, notary public, on September 11, 1896. The plea and affidavit were filed on September 12, 1896. On the latter day, September 12, 1896, an order was entered by the court vacating and setting aside the default against the defendant, Curran, and giving him leave to plead instanter.

The evidence shows conclusively, that the signature to the affidavit of merits is not the signature of Richard Curran, and that he never signed any such affidavit. Even Gay Dorn, the notary before whom the affidavit purports to have been made, admits that Richard Curran, the defendant in the suit, did not appear before him and sign any such affidavit. The respondent, Pickler, says that he was absent in Michigan on a pleasure trip, and did not reach home until the afternoon or evening of September 12, 1896, and that he then learned for the first time that default had been entered against Curran. The testimony, however, of both Curran and Branaman tends to show, that the respondent returned on September 11, 1896. Curran says that he saw in the *Law Bulletin* that the default of September 10 had been entered against

him, and that he went to Pickler upon September 11 to see him about getting the default set aside. Branaman swears that he knew nothing about any of the papers, but signed the entry of appearance—if he did sign it—at the request of Pickler. He says that he went into court on September 12, with a notice, given to him by Pickler, of a motion to set the default aside, which purported to have been served on the attorneys of the plaintiff, and upon which an agreement with the plaintiff's attorneys was endorsed, consenting to the setting aside of the default. He states that Pickler told him to go to the court, and, when the motion should be called, to state to the court that it was an agreed motion, and that he did so, and that the default was set aside. An expert witness, who swears that he is acquainted with the handwriting of the respondent, Pickler, and has seen him write, also swears that the name, Richard Curran, signed to the affidavit of merits is in the handwriting of the respondent, Pickler. We think that the testimony of Curran and Branaman, of Henry L. Tolman, the expert, and of Dorn, taken together, overcome the denial as to this matter of the respondent, Pickler. We can come to no other conclusion than that he prepared and filed the sworn plea, dated September 11, 1896.

But if there are any doubts about the correctness of the statement already made upon this branch of this subject, there can be no doubt about the guilty participation of the respondent in what subsequently took place.

The attorneys for the plaintiff in the suit against Curran made a motion on September 17, 1896, to vacate the order entered on September 12, 1896, which set aside the default, upon the ground that the attorneys of the plaintiff had had no notice of the motion to set aside such default. In resistance of the motion to set aside the default, the respondent prepared and presented to the judge of the superior court an affidavit, purporting to have been signed and sworn to by Richard Curran on September

19, 1896. The signature to this affidavit was forged, the proof being clear that Curran did not sign it. Before, however, the presentation of this affidavit and on September 14, 1896, a paper, purporting to be a withdrawal of Branaman as attorney for Curran, was filed in the cause, and on the same day the appearance of the respondent as attorney for defendant, Curran, was filed in the cause. An order was entered on the respondent, Pickler, to produce the affidavit of September 19, but he did not do so. Respondent claims that the affidavit of September 19 was lost; that it must have been left on the clerk's desk, or swept away by the janitor, or taken away by some one, and that he was unable to produce it. Respondent admits that the signature to the affidavit was not the signature of Richard Curran. He states that he drew the affidavit for Curran to sign, and called at Curran's office, but Curran was absent; and that he left the affidavit there upon Curran's desk with a note requesting that the same be signed and returned to him; that he found the affidavit in an envelope on his desk next morning, and that he read the affidavit before the judge of the superior court.

The motion to set aside the order vacating the default was continued until October 10, 1896. When this motion came on for hearing, the respondent resisted the same, and presented, in resistance thereof, two affidavits, one purporting to be signed by Richard Curran and purporting to have been sworn to by Richard Curran before David E. Towne, notary public, on October 7, 1896, and the other, purporting to be signed by one Tim Dean, and purporting to have been sworn to on the 8th day of October, 1896, before David E. Towne, notary public. At this time Branaman, according to the testimony of the respondent, was not in Chicago but in Indiana, or somewhere out of the State of Illinois, and, therefore, could have had nothing to do with the preparation or presentation of the affidavits of October 7 and 8. These affida-

vits were read by the respondent before a judge of the superior court of Cook county on October 10, 1896. The evidence is clear and conclusive, that the body of these affidavits and the endorsements upon the back thereof were in the handwriting of the respondent, Pickler.

As to the affidavit of October 7, purporting to be signed by Richard Curran, the testimony is clear and overwhelming, that the signature thereto is not the signature of Richard Curran, and that Richard Curran never signed the affidavit. As to the affidavit purporting to have been made by Timothy Dean, no such man is known, or ever was heard of by anybody so far as the record shows. Towne, the notary before whom the affidavit of October 7, 1896, purports to have been sworn to by Richard Curran, is not willing to say that the Richard Curran, who is defendant in this suit, appeared before him and signed the same; he says, "I have no distinct recollection who came before me when I drew this *jurat;* I would say that my mind was an absolute blank as to who came before me at that time; I have no distinct recollection as to the next affidavit purporting to be signed by Timothy Dean; I do not know anybody personally named Tim Dean or Timothy Dean." Richard Curran swears that he never signed the affidavit, and that the signature thereto is not his signature. At this time Pickler had an office on the eighth floor of the Marquette Building, and the office of Towne was on the same floor, though four or five doors removed from the office of the respondent. The respondent denies, that he signed the names of Richard Curran and Timothy Dean to these affidavits. He makes the same statements in regard to the manner in which he came into possession of the affidavits after the *jurats* were attached to them, which he makes in regard to the affidavit of September 19. The testimony of the respondent is that, after preparing the affidavits, filed October 10, of Richard Curran and Timothy Dean, he left them at Curran's office unsigned upon Curran's

desk, with a note that they be signed and sworn to and returned to him; that, before October 10 when the affidavits were used to resist the motion, he found them on his desk among his mail, signed and sworn to, as they appeared when they were presented in court. He says that he does not know who signed the affidavit purporting to be signed by Curran, or who signed the affidavit purporting to be signed by Timothy Dean. He says that the affidavits, after being signed and sworn to, were left on his desk, but whether they came by mail or by messenger he is unable to state. Curran, however, says that he never found on his desk, nor anywhere else in his office, the affidavit of himself sworn to before Towne on October 7, 1896, and the affidavit of Tim Dean sworn to on October 8, 1896, before Towne; and that he never saw the affidavits until he saw them in the superior court. He swears clearly and positively that he never took these affidavits, either before or after they were signed, or sent them, to the office of Charles Pickler, the respondent. He furthermore says that he never knew such affidavits had been made or filed in the case, until he was cited to appear before the superior court in answer to a charge of contempt of court.

Mr. Tolman, who was acquainted with the handwriting of the respondent and had seen him write, testifies that the signatures of Richard Curran and Tim Dean to these affidavits were in the handwriting of the respondent, Pickler. The respondent says that he drew the affidavits from information given to him by Branaman. The affidavit purporting to be signed by Richard Curran states, that he (Curran) is not the person who signed the note sued upon, and never had any dealings with the plaintiff in the suit. The testimony of Curran shows that this statement was untrue. Curran, in his testimony, says in substance, that he had no defense to the suit, and that he did sign the note, but that he merely wanted time to raise money to pay it. The affidavit, purporting to

be signed by Tim Dean, assumes to state the substance of a conversation which Dean is alleged to have had with Branaman at Hammond, Indiana, on October 5, 1896. This affidavit bears internal evidence, contradictory of the statement made by the respondent that the facts stated in it were furnished to the respondent by Branaman. If any such interview took place between the man, named Dean, and Branaman at Hammond, Indiana, on October 5, 1896, the respondent must have been informed of it by Dean. Dean does not appear in this case, and does not appear to have been known to anybody in the case. The respondent has not explained his knowledge of Dean, or his connection with him, or how he happened to draw an affidavit, which was to be signed by Dean. The name, Timothy Dean, as the name of the affiant, appears in the body of the affidavit in the respondent's handwriting, and no explanation is given by him as to how he obtained the name, Dean, or how he learned what Dean could swear to, so as to draw the affidavit. Curran did not give him the name of Dean, because Curran had never heard of any such man. He says in his testimony, that he "based those affidavits upon my memorandum of facts which had been communicated to me by Branaman." It is difficult to understand how this could have been so, when Branaman was out of the State and when the matter, set up in the affidavit purporting to have been signed by Dean, could not have had any existence before October 5, 1896.

After a careful examination of all the evidence in the record upon both of the charges made against the respondent, we are of the opinion that those charges are sustained by the proofs.

Let the rule in this case be made absolute, and let an order be entered striking the name of Charles Pickler, the respondent herein, from the roll of attorneys of this court in accordance with the prayer of the information herein filed.          *Rule made absolute.*