## IN THE MATTER OF GEORGE K. FRENCH, ATTORNEY AT LAW.

## No. 1563.

### ORIGINAL.

TRIAL OCTOBER 23, 1924.            DECIDED NOVEMBER 18, 1924.

PETERS, C. J., PERRY AND LINDSAY, JJ.

ATTORNEY AND CLIENT—*suspension and disbarment—duties of attorneys.*

Attorneys owe the duty of good faith and honorable dealing to the judicial tribunals before which they practise their profession. They are officers of the court. Their high vocation is to correctly inform the court upon the law and the facts of the case and to aid it in doing justice and arriving at correct conclusions. An attorney violates his oath of office and his duty when he resorts to deception with the purpose of deceiving and misleading the court.

SAME—*same—grounds of disbarment—conspiracy, abuse of process and presentation of deliberately false testimony.*

An attorney who plans and executes a conspiracy to defeat the claim of a creditor by preparing a fictitious promissory note, bringing suit thereon and obtaining a fraudulent judgment and order of garnishment of the debtor's salary, who commits an abuse of the process of the court by securing, with the aid of the void note, the issuance of summons against the fictitious defendant and the garnishee and by obtaining the fraudulent judgment and final order of garnishment, and who, for the purpose of influencing the court and obtaining a favorable judgment, presents his own deliberately false testimony, is guilty of professional misconduct and should be disbarred, irrespective of whether the false testimony so presented was material or immaterial to the issues before the court.

OPINION OF THE COURT BY PERRY, J.
(Peters, C. J., concurring in part and dissenting in part.)

This is an information by the attorney general, charging the respondent with professional misconduct. The facts in the case are not difficult of ascertainment.

Almost in their entirety, they are shown by undisputed evidence.

About May or June, 1923, one Mills Armstrong came to Honolulu from the mainland under engagement to enter the employment of Hawaiian News & Thrum's, Limited, a Hawaiian corporation doing a mercantile business in this city, at a salary of $50 per week. The corporation advanced for him the cost of his passage hither and that of his family and he signed and delivered to his employer a promissory note, payable on demand, in the sum of $286, to cover the advances just mentioned. Armstrong's testimony is that, under the terms of his employment, it was his duty to repair typewriting machines for the corporation but that soon after the commencement of his employment he was requested (and consented) to perform certain work not within the terms of his original employment, to wit, the repairing of adding machines, and that it was orally understood between his employer and himself that for this extra work he would be paid "an additional salary." Upon this note Armstrong subsequently paid a total of $60 on account in instalments of $5 per week. The employer made demand several times for the balance.

Armstrong remained in the employ of Hawaiian News & Thrum's, Limited, for a period of eight months and early in February, 1924, entered the employ of the Office Supply Company, Limited, also a Hawaiian corporation doing business in this city, at a salary of $200 per month. Hawaiian News & Thrum's, Limited, continued making demands for the amount of the balance of the note and on or about February 29, 1924, threatened suit. The total of Armstrong's debts other than the note in favor of Hawaiian News & Thrum's, Limited, did not at this time exceed $50.

Armstrong did not at any time receive from Hawaiian

News & Thrum's, Limited, payment or allowance for the extra compensation above mentioned.

On February 29, 1924, after the threats of litigation had been made, Armstrong called on respondent at the latter's office, related to him all of the foregoing prior history, told him that he wished to avoid paying the balance of the note, saying that he believed the extra compensation fully met the balance that otherwise would have been due and also that he thought he could not prove to the satisfaction of the court the agreement for extra pay because it was oral, and asked respondent for advice as to how to accomplish his object.

Respondent said to Armstrong that he would not advise him to go into bankruptcy, giving as his reason that Armstrong was still a young man and that it would be unwise for him to pass through bankruptcy so early in his business career. Respondent did not advise Armstrong to await suit by Hawaiian News & Thrum's, Limited, on the note and to defend against that suit by presenting his claim for extra compensation, either by way of counterclaim or otherwise. Nor did he advise Armstrong that the worst that Hawaiian News & Thrum's, Limited, could accomplish by bringing suit would be to get judgment for the balance found by the court to be due on the note and to enforce that judgment by garnisheeing one-fourth of his salary receivable from the Office Supply Company, Limited, as it accrued on each pay day. The advice given was that Armstrong execute and deliver to the respondent a promissory note whereby Armstrong would promise to pay to the respondent or order on demand the sum of $320 together with interest thereon at the rate of 9% per annum; that an action would be brought on that note against Armstrong; that in that action his employer, the Office Supply Company, Limited, would be joined as garnishee; that

upon recovery of judgment in the action, the judgment would be enforced by collecting from time to time from the garnishee one-fourth of Armstrong's salary. In this plan of action Armstrong acquiesced. At this point it should be added that the amount to be inserted in the note was arrived at in this way: Armstrong had stated to the respondent that he, Armstrong, planned to leave the employ of the Supply Company about the middle of June, 1924, and between the two it was calculated that the sum of $300 would cover the amount that Hawaiian News & Thrum's could during the intervening period recover out of Armstrong's salary by garnishment thereof if it should bring a suit on the note which it held from Armstrong. It was thought, however, that "an odd amount would be better" and the amount was consequently fixed at $320. It was also agreed that Armstrong, if asked, should say that respondent had loaned that amount to him. In truth and in fact Armstrong did not at the time of the note owe to the respondent and has not at any time owed to him $320 or any other sum of money. The note was entirely without consideration and this, of course, was fully known to the respondent. It was in every respect a fictitious note. Respondent asked Armstrong not to tell the Office Supply Company about the proposed proceedings.

In pursuance of these suggestions of the respondent and of the plan of action adopted by him and Armstrong, the respondent on the same day of the interview prepared a note reading as follows:

"$320.00          Honolulu, Hawaii, September    1923

"On demand after date, without grace, I, or we, or either of us, promise to pay to G. K. French or order, at Honolulu, T. H., the sum of Three hundred and twenty dollars, in gold coin of the United States of America of the present standard value, together with

interest thereon in like gold coin at the rate of nine per cent per annum from date until paid, for value received."

It was signed by Armstrong, with the date blank. The date was subsequently inserted by or at the instance of the respondent as September 26, 1923. By indorsement the note was shortly thereafter assigned by the respondent to one John Pahk, a Korean clerk in his office, and the action thereon was brought in the name of Pahk as plaintiff and assignee. In the respondent's office and by his direction, a declaration and summons in an action of assumpsit based upon the fictitious note were prepared, the Office Supply Company, Limited, as employer and debtor of Armstrong, being joined as garnishee; and the declaration was filed in the district court of Honolulu and the summons issued on March 1, 1924, returnable on "the first Monday following the date of service" which first Monday was probably March 3, 1924. There were continuances of the case from time to time and on March 17, 1924, the hearing was had.

The essential parts of the declaration read as follows: That the plaintiff "for cause of action alleges:

I.

"That defendant, on September 26, 1923, at said City and County of Honolulu, made and delivered his certain promissory note to G. K. French, or order, for the sum of $320.00, payable on demand, which said promissory note is in words and figures as follows:" (Copy of the note was here set forth.)

II.

"That subsequent to the making and executing of the aforesaid promissory note said G. K. French demanded payment thereof, but said defendant failed and refused to pay same or any part thereof; that prior to the bringing of this suit said G. K. French, by an instrument in writing, duly assigned all of his right, title and interest in and to said promissory note to said John

S. Pahk, plaintiff herein, who is now the holder and owner of said promissory note.

### III.

"That, by reason of the premises defendant is indebted to plaintiff in the sum of $320.00, with interest thereon from September 26, 1923, at the rate of nine per cent per annum until paid."

The minutes of the testimony and proceedings, which minutes are usually made by the clerk and not the magistrate but in this instance are not controverted in any way, read as follows:

"On motion of plaintiff complaint is amended by alleging that assignment of claim was made by endorsement.

"George K. French, sworn: I offer in evidence this promissory note by Mr. Armstrong. There is a credit of $8.00 allowed, leaving a balance of $312.00. The balance is still due, owing and unpaid.

"Note offered and received in evidence, marked Plaintiff's Ex. 'A.'

"Defendant works for the garnishee at $50.00 a week." In pursuance of the plan as arranged and although service of summons was duly made upon him, Armstrong did not file any answer or other pleading or appear in the district court in the action, either personally or by counsel; and the respondent was the only witness who testified on behalf of the plaintiff, Pahk. The magistrate immediately upon the conclusion of the testimony gave judgment for the plaintiff and against Armstrong as follows: for principal claimed, $312; for interest, $13.42; for attorney's commissions, $15.63; for costs of court, $4.05; for police fees, $2; for garnishee fees, $1; for transcript of judgment, 50c,—in all for the sum of $348.60. By the same judgment the garnishee was directed to pay to the plaintiff out of Armstrong's salary from time to time as the same became payable to him twenty-five per cent. of

that salary, this being the usual garnishee order in such cases.

At the same interview in which the conspiracy above outlined was formed, it was arranged that Armstrong should pay to the respondent $25 for his services in executing the same and the further sum of $8 to be deposited as costs of court in the action to be brought upon Armstrong's note to respondent. He made both of these payments on the same day. Respondent gave him a receipt for the $33 "in full of all a/cs," explaining that thus Armstrong would be protected in the event of respondent's death. It was also arranged at the same original interview that all sums which should be received from the Office Supply Company, Limited, as garnishee under the judgment to be recovered, were to be immediately delivered by respondent to Armstrong. About five payments, in the sum of $25 each, subsequently were made under the order of the court by the Office Supply Company to the respondent as the attorney for the plaintiff. All of these amounts so collected from the Office Supply Company, Limited, were promptly paid, in accordance with the arrangement, to Armstrong.

After the institution of Pahk's suit, the Hawaiian News & Thrum's brought suit against Armstrong, with garnishment of the Supply Company. Armstrong took the summons and declaration to respondent and the latter immediately tore them up and threw the remnants into a waste-basket.

Practically the only dispute as to the facts of the case consists in this: that under the testimony of Armstrong it appears that the whole purpose of the plan suggested by the respondent and of the execution thereof was in order thereby to aid Armstrong in thwarting the efforts of the Hawaiian News & Thrum's, Limited, to secure payment of the balance due it on the note given

to it by Armstrong, while the contention on behalf of the respondent is that in forming, suggesting and executing this plan, he was moved by purely charitable purposes and was carried away on the moment by the desire to help Armstrong and that his purpose was not to defeat the creditor (the Hawaiian News & Thrum's, Limited) but to place Armstrong in a position where he could pay his creditors at such times and in such amounts as it might please him or, as testified to by the respondent, "as he could and when he could" or, as stated in respondent's formal answer in this case, so "that he might make his own terms with his creditors." It is to be noted that the total of Armstrong's debts other than that to the Hawaiian News & Thrum's, Limited, did not exceed $50 and that none of these creditors were pressing their claims; also that the maximum which could be garnisheed by the respondent or Pahk in the district court action was only $50 a month; that three-quarters of Armstrong's salary receivable from the Office Supply Company, Limited, was beyond the reach of the process of garnishment and that, without the suit equally as well as with the suit, this three-quarters of the salary or as much thereof as he chose to devote to the purpose could be used for the payment of his debts, and that all of this was known to the respondent as a lawyer. It does not appear that the respondent, upon the making of each collection from the Office Supply Company, Limited, made any effort to see that Armstrong was applying the sum collected in accordance with any supposed plan of equitable distribution amongst his creditors or that he was paying it to any of his creditors at all. It is further to be observed that while the plan of a fictitious note and suit was formed and suggested upon Armstrong's first call at respondent's office, nevertheless, some time elapsed while the papers in the action were

being prepared (the declaration as filed was dated March 1, 1924, and the summons was issued on March 1, 1924) and during which the respondent could have devoted further thought to the proposal as made and, more than that, that a period of seventeen days elapsed between the formation of the conspiracy and the trial of the action. This was ample time for further thought and repentance if the plan in its inception and formation is to be attributed to a sudden charitable impulse.

If the purpose of the respondent was, as he testified, to enable Armstrong to pay his creditors at the times and in the amounts that he chose, the case is not materially altered in his favor. It would be the equivalent of a purpose to enable Armstrong to delay any and all of his creditors indefinitely. The creditors were entitled to pursue at *their* option and not at *Armstrong's* option the remedies open to them under the law.

That the representation made under oath by the respondent to the district magistrate in presenting the note itself and in offering it in evidence as the note sued on was false and that his testimony that "the balance" (of $312) "is still due, owing and unpaid" was false does not admit of any doubt. Even the statement that "there is a credit of $8.00 allowed," which was intended, doubtless, to create in the mind of the judge the idea that the plaintiff and the witness were liberal and fair to the absent defendant involved a falsehood. Armstrong had not at any time paid $8 or any other sum on account of the note. The $8 which he paid was solely to meet the costs of the action. It is urged, however, in respondent's behalf that these false statements nevertheless did not constitute perjury because, as it is claimed, they were not material. The immateriality in this instance is said to consist in the fact that payment is an affirmative defense, that the plaintiff could have

rested without adducing any testimony to the effect
that the note was unpaid and that the testimony as given
was, therefore, unnecessary and for that reason imma-
terial. It is true that, in order to satisfy our statutory
crime of perjury, the false statement must be of "some
material fact." R. L. 1915, Sec. 4033. Testimony or
other evidence is not immaterial merely because it is
cumulative. "False testimony is deemed material not
only when directly pertinent to the main issue, but also
when it has a legitimate tendency to prove or disprove
any material fact in the chain of evidence." 30 Cyc.
1418. "The test of materiality is whether the statement
made could have influenced the tribunal upon the ques-
tion at issue before it. Any statements made in a judicial
proceeding for the purpose of affecting the decision, and
upon which the judge acted, are material." 22 A. & E.
Ency. L. 687. "Nor can a witness who falsely denies
before the grand jury any knowledge of a fact material
to the investigation defend a charge of perjury on the
ground that the evidence sought from him would have
been merely cumulative." 30 Cyc. 1420. "The degree
of materiality is immaterial. It is sufficient if the testi-
mony was circumstantially material, though not in itself
sufficient to establish the issue." 22 A. & E. Ency. L.
688. "As to the materiality of the matter to which the
prisoner testified, it must appear either to have been
directly pertinent to the issue or point in question, or
tending * * * to induce the jury or judge to give readier
credit to the substantial part of the evidence. But the
degree of materiality is of no importance; for, if it
tends to prove the matter in hand, it is enough, though
it be but circumstantial." 3 Greenl. Ev. (16th ed.)
Sec. 195.

It may be that, in this action in the district court,
in the absence of a contest the plaintiff could have safely

rested upon the legal presumption, if such there is, of nonpayment of the note; but he was not obliged to do so. If through ignorance of the existence of this supposed inference of fact he adduced express testimony of nonpayment he was within his legal rights in doing so. So also if, even with knowledge of the existence of the supposed inference, he chose in order to run no possibility of an adverse judgment and no possibility of a reversal of some sort upon a review by a higher court to adduce express testimony to the effect that the note was unpaid, he was equally within his rights in doing so. Careful attorneys very often do that which, after a favorable judgment, may seem to have been an unnecessary duplication of testimony or other evidence; but cumulative testimony given after some testimony is already in on the subject is not for that reason to be deemed immaterial. It is material even though it may have been strictly unnecessary in order to produce in the magistrate or court a favorable impression of the claims of fact made by the attorney on behalf of his client.

Whether or not the note was unpaid in whole or in part was an issue of fact to be determined by the judge just as it was an issue of fact whether the note was issued for a valuable consideration. The mere fact that in the first instance a presumption of fact accrued in favor of the plaintiff and in the second instance the presence of the words "value received" would constitute a *prima facie* showing of consideration does not render it any the less true that the issues just mentioned in reality existed and were to be determined by the court. In the district court action now under consideration the testimony of the respondent was material.

Assuming, however, that the testimony in question was immaterial, that would be of no consequence in the case at bar. The respondent's dereliction of duty was not

any the less real or the degree of moral turpitude involved any the less merely because it is now found that the testimony was immaterial or even because at the moment of its utterance the respondent knew or felt that it was immaterial. The testimony was false. He gave it deliberately and gave it for the purpose of thereby inducing the magistrate to render a judgment favorable to the plaintiff ("Why, it was the only manner in which I could get my judgment," he testified in this court),— such a judgment as would enable Armstrong and the respondent to accomplish the purpose of placing beyond the reach of the Hawaiian News & Thrum's, Limited, that part of Armstrong's salary which otherwise could be garnisheed. This supposed immateriality, even if it existed as such, cannot possibly be regarded in respondent's favor, either as justification or as mitigation.

In a case in which an attorney was disbarred on proof of his having committed perjury, the court said, *inter alia*: "The question of whether or not the subject-matter of the alleged perjury was material is not of itself of consequence in this inquiry. Perjury by an attorney as a witness upon an immaterial matter would be equally as good ground for disbarment as if his testimony were material; it would involve the same degree of moral turpitude." *In re Ulmer,* 208 Fed. (Dist. Ct., N. D. Ohio) 461, 468.

In another case the attorney was found to have subscribed to an affidavit containing false statements. No formal oath had been administered. The court, recognizing that the crime of perjury had not been proved, nevertheless disbarred the attorney. *In re Keegan,* 31 Fed. (Cir. Ct., D. Colo.) 129, 130, 133. In a case entitled *"In re Klatzkie,"* 126 N. Y. S. 842, 843, the respondent was disbarred because of "deliberate false swearing." The court said: "This testimony was satisfactorily, and

indeed conclusively, shown to have been false, in so far
as concerns the statement that Mr. Higgins had told
respondent that he (Higgins) had sent a letter to Bishop,
over his own signature, suspending him. Higgins never
had sent such a letter, and never told respondent that
he had sent it. The importance and materiality of the
evidence, from the respondent's point of view, lies in the
fact that as no authority appeared to be vested in Higgins
to suspend, if he had attempted to suspend Bishop, his
act would have been void, and Bishop would have been
entitled to recover salary during the period of attempted
suspension. It is immaterial whether respondent's view
of the law was correct or not; the important fact being
that he testified falsely, believing that his evidence was
material and would be helpful to his client."

The respondent is fifty-six years of age, graduated
from Georgetown University in 1889 with the degree of
LL. B., was admitted to the bar of the District of Co-
lumbia in 1889, practised there as an attorney until De-
cember, 1895, later practised law in Arizona for five
years, practised for short periods in California and
Alaska, and in Hawaii has practised as an attorney
from the year 1915 to date. We find it impossible to
believe that he did not understand the true nature of
his acts or that he failed to realize that he was engaged
in a wrongful conspiracy, that he was abusing the process
of the courts, that his testimony was deliberately false
and that he was giving it in order to deceive and mis-
lead the court.

To summarize, our finding is that the respondent
planned and carried out a conspiracy to prevent, by
illegal means, the Hawaiian News & Thrum's, Limited,
from pursuing the remedy expressly allowed it by law
to prove in court its claim against Armstrong, to garni-
shee Armstrong's employer and to enforce payment of

the judgment out of Armstrong's salary; that he was
guilty of abusing the process of the courts, first, by filing
a fictitious claim based wholly upon a fictitious and void
note known to him to be void and by securing the issu-
ance of process citing the Office Supply Company, Lim-
ited, as garnishee and, secondly, by obtaining a judgment
and the equivalent of execution thereon, with the aid of
his fictitious pleadings and false testimony; and that in
the testimony that he gave in support of the fictitious
action and in the endeavor to induce the court to render
the desired judgment he committed perjury in all of its
essential elements.

Under these circumstances, what should the order of
this court be? A reference to a few authorities showing
what other courts have said and done under similar cir-
cumstances will not be out of place.

"It goes without saying that in our profession the
highest obligation is to truth and honesty, and that he
who would be a lawyer should by his own conduct, as
well as by the advice which he gives to his clients, seek
to promote truth and establish justice; and while it is
a painful duty to perform, yet I conceive it to be a duty
from which no judge can shrink, that whenever the con-
duct of any member of the bar is challenged, if it
appears that that conduct is inconsistent with profes-
sional obligations, and is evidence of moral dishonesty,
the court should, discharging its duty to the profession
and the community, strike that man's name off from the
roll of the court." *In re Keegan,* 31 Fed. 129, 133.

"The imposition of the penalty is not merely for
the purpose of punishing the wrongdoer. It is even
more for the protection of the profession and the public."
*In re Humphreys,* 15 Haw. 155, 207.

In *People* v. *Keegan,* 18 Colo. 237 (not the same
case above cited from 31 Fed.), the respondent conspired
with others to cheat and defraud one William Bergman
and in pursuance of the conspiracy "procured said Berg-

man, without any consideration therefor, to execute his promissory note for $1790, payable to Fanny Crane;" brought suit upon the note, persuaded Bergman to acknowledge service of summons and to sign and file an answer prepared by the respondent, procured judgment on the pleadings and issued execution thereon "with knowledge that the note was without consideration and the judgment so obtained null and void." The court said: "Without noticing in detail the evidence furnished by the record, it is conclusively shown thereby that the respondent was guilty of conduct highly reprehensible and grossly unprofessional, and that justly brings reproach upon the honorable profession to which he belongs.

"The duties imposed upon members of the bar clothe them with important fiduciary responsibilities and make them amenable to obligations that other members of the community do not share. In no other calling should so strict an adherence to ethical and moral obligations be exacted, or so high a degree of accountability be enforced.

"A good moral character is one of the essential requisities to admission to the bar in this state, and the tenure of office thereby conferred is during good behavior; and when it appears, upon full investigation, that an attorney has forfeited his 'good moral character,' and has by his conduct shown himself unworthy of his office, it becomes the duty of the court to revoke the authority it gave him upon his admission. 'It is a duty they owe to themselves, the bar and the public, to see that a power which may be wielded for good or for evil is not intrusted to incompetent or dishonest hands:' *Mills Case,* 1 Mann, 393."

"The lawyer's duty is of a double character. He owes to his client the duty of fidelity, but he also owes the duty of good faith and honorable dealing to the judicial tribunals before whom he practices his profes-

sion. He is an officer of the court—a minister in the temple of justice. His high vocation is to correctly inform the court upon the law and the facts of the case, and to aid it in doing justice and arriving at correct conclusions. He violates his oath of office when he resorts to deception, or permits his clients to do so. He is under no obligations to seek to obtain, for those whom he represents, that which is forbidden by the law. If he suffers false and perjured testimony to be presented to the presiding judge, with the possible result of inducing the latter to take jurisdiction of a cause, in which there would otherwise be no power to act, and to grant a judgment or decree which the law would prohibit if the real character of the offered testimony were known, he cannot shield himself behind his supposed obligations to his client." *People* v. *Beattie,* 137 Ill. 553, 574. In this case the attorney presented to the court testimony known by him to be false and with the aid thereof obtained a decree of divorce.

"Too much is staked upon the honesty and good conduct of lawyers for courts to wink at flagrant misconduct. They are trusted by the community with the care of their lives, liberty and property, with no other security than personal honor and integrity. It behooves the courts and the profession to see that their brotherhood keep clean records." *In re Henderson,* 88 Tenn. 531, 539. In this case the attorney introduced in evidence a copy of a judicial decree in the dictating of which to his clerk who made the copy he omitted certain portions in the belief and with the purpose of better supporting his contentions by making the omissions. The court added in its concluding words that the respondent had been "guilty of such acts of immorality, impropriety and unprofessional conduct as are inconsistent with the

character and faithful discharge of the duties of the profession" and made the rule absolute.

"There is no duty imposed upon a court more important than that of preserving, to the best of its power and ability, the professional integrity and purity of its bar.   Courts are established for the administration of law and justice.   The attorneys who constitute its bar are an integral part of the court." *In re Badger,* 35 Pac. (Idaho) 839.   In this case the attorney persuaded a person to appear in a United States Land Office and make oath to an affidavit relating to desert land entries and to falsely personate and represent herself to be another person who had prior thereto made a desert land entry at such office.

"We can see no difference in moral turpitude between fraud and misrepresentation in procuring an original order for the payment of alimony, and fraud and misrepresentation in enforcing payment upon an order already made. * * * 'The standard of personal and professional integrity which should be applied to persons admitted to practice law in the courts is not satisfied by such conduct as merely enables them to escape the penalties of the criminal law.'

"This court has always held that a high sense of personal and professional integrity must be observed by members of the profession, not only toward clients but toward the courts in which they practice.   They are a part of the machinery of the law for the administration of justice, and it is indispensable that courts shall in a large measure be able to rely upon their good faith and fair dealing.   It is no hardship to make this requirement, and it cannot be relaxed without great detriment to the profession and to the proper administration of justice. Men who cannot conform to the standard fixed must employ their talents in other fields than the legal profes-

sion." *People* v. *Barrios,* 237 Ill. 527, 539, 540. In this instance an attorney had procured enforcement of an order for alimony, upon false affidavits and false oral representations to the court.

"There can be no question but that the offense is a serious one, involving as it does the relation of an attorney and counselor at law to the court of which he is an officer, and at the same time the obligation of an attorney to his client. Assuming that his professional obligations to his client would justify his not revealing to the court the facts that he had acquired from his client during the existence of the relation, the obligation to his client did not justify him in deceiving the court or continuing to prosecute a claim which he knew was based upon perjured testimony. Much less would it justify him in producing his client as a witness, and insisting upon her right to recover when he knew that her testimony was knowingly false. By proceeding with the trial after having become aware of the fact that it was based upon perjured testimony, the attorney made himself a party to the attempted fraud upon the court and the defendant." *In re Hardenbrook,* 121 N. Y. S. 250, 257, 258.

In all of these cases an order of absolute disbarment was entered.

See also the following: *In re Robinson,* 136 N. Y. S. 548, 556, 557; *Boston Bar Assn.* v. *Greenhood,* 168 Mass. 169, 187, 188; *In re Ryan,* 143 N. Y. 528, 530, 531; *In re Rockmore,* 123 N. Y. S. 928, 929; *In re Lamb,* 94 N. Y. S. 331, 340, 341; *In re Raisch,* 83 N. J. Eq. 82, 84, 85; 6 C. J. 584, 585, 596, 597; and 2 Thornton on Attorneys at Law, Secs. 816, 817, 822, 824, 825, 826, 827, 831, 852.

The quotations above made from the opinions of other courts commend themselves to us as correct statements of the duties and obligations of attorneys and of the principles which should guide them in their conduct to-

wards the courts and their fellow-men, as well as of the responsibilities resting upon courts in proceedings such as that at bar. We do not fail to realize the seriousness to the respondent of an order of disbarment. We appreciate the propriety of the rule that in such cases the proofs must be convincing and clear. In the case at bar we find no room to doubt what the facts were. While the duty is a disagreeable one, we are of the opinion that the circumstances of the case are such as to require that the respondent should be disbarred. A decree to that effect will be signed upon presentation.

*H. R. Hewitt,* First Deputy Attorney General (also on the brief), in support of the information.

*J. B. Lightfoot* (*Lightfoot & Lightfoot* on the brief) for respondent.

### OPINION OF PETERS, C. J., CONCURRING IN PART AND DISSENTING IN PART.

The respondent is unquestionably guilty of perpetrating a gross fraud which merits disbarment. My difficulty is in determining what it should be—absolute disbarment or suspension for a fixed period. Disbarment "may be absolute, leaving the party to apply to the court for readmission if his offense was of such a kind that, after the lapse of time, he can satisfy the court that he has become trustworthy; or for a stated time, if the court is of opinion that the interests of the public will thereby be sufficiently protected." *Bar Association* v. *Greenhood,* 46 N. E. (Mass.) 568, 574. See also *In re Shepard,* 67 N. W. (Mich.) 971, 972; *In re Hill,* L. R. 3 Q. B. 543. In the case of absolute disbarment the judgment in effect is indeterminate. The exclusion from practice is for all time unless the court should see fit to readmit upon application therefor. In the case of suspension the judgment is determinate and fixes in advance the limitation of punishment. The distinction in punishment

seems to lie in the moral aspect indicated by the delinquent. If the offense of which he is guilty involves a degree of moral turpitude from which the court can reasonably conclude that the accused has become so lost to the sense of professional proprieties as to render him unfit to practice then the judgment of disbarment should be absolute. On the other hand, if from the character of the offense and from previous good moral character of the delinquent the court can reasonably conclude that the delinquency was a temporary moral lapse of which the delinquent may be purged and morally regenerated by exclusion from practice for a limited period then the judgment should be suspension.

I do not believe that the respondent by his acts and conduct has forfeited all consideration or that he has shown himself· to be absolutely unfit to practice. He has been a member of the bar of Hawaii since April 18, 1916. His application was accompanied by the usual certificates of good moral character and showed him to be in good standing in the supreme courts of the districts of Columbia and Alaska and the State of California. He was graduated by the Georgetown University in 1889 and in the' same year was admitted to the practice of the law in the supreme court of the District of Columbia. Before coming to Hawaii he· had been actively engaged in practice for approximately twenty-two years —in all to date about thirty years. This is his first delinquency. He is now fifty-six years old. His education and age militate against adaptability to other employment for the support of himself and his family. While punishment of the respondent is merely incidental to the judgment of disbarment it must nevertheless be considered. It seems to me that absolute disbarment is unduly harsh and severe and that in suspension for a term of years the public will be sufficiently protected.

Peters, C. J., concurring in part and dissenting in part.

The disgrace of these proceedings, the resulting humiliation and suffering to which the respondent will necessarily be subjected and the enforced suspension from practice for a reasonable period of years, would, I am confident, be ample assurance of moral regeneration entitling him to the future respect of both the public and the courts.

Many cases may be cited where under facts showing culpability equal to that indicated in the instant case the judgment of disbarment was for a stated period. I consider them, however, of no greater value than cases in which absolute disbarment was ordered. Each case must be determined upon its own facts. "The power" (of disbarment) "is not an arbitrary and despotic one, to be exercised at the pleasure of the court, or from passion, prejudice or personal hostility; but it is the duty of the court to exercise and regulate it by a sound and just judicial discretion." *Ex parte Secombe,* 19 How. (U. S.) 9, 13. Precedent in this jurisdiction is not wanting for cases of suspension. In the case of *In re Davis,* 15 Haw. 220, the respondent was absolutely disbarred on August 10, 1903. On June 20, 1904, however, the judgment of absolute disbarment was modified and corrected to suspension until the first day of the October Term, 1904. Similar proceedings against the same respondent in the United States District Court of Hawaii, depending, as I understand it, upon the same facts, resulted in three months' suspension. *In re Davis,* 2 U. S. Dist. Court Hawaii 54, 76. There Judge Sanford B. Dole, the author of the opinion, said: "The end to be sought in proceedings of this character is to uphold a high standard of honor in all the relations that exist between courts and those whose interests they adjudicate, and, as a consequence thereof, to insist upon such a standard therefor for all those who take part, as of-

ficers of the court, in this important duty. Disbarment is not called for under the showing made in this case and it is not necessary, under the principles mentioned above, to blast the prospects of the respondent and neutralize his years of preparation by such sentence. It is sufficient that the court express by a judgment, not unreasonably severe, its definite policy in regard to the responsibility of its officers." In the case of *In re Humphreys*, 15 Haw. 155, the respondent was absolutely disbarred and on June 23, 1904, upon motion for modification of the order of disbarment, was reinstated. See also *In re Barenaba*, 5 Haw. 279 (suspension for three months); *In re Paakiki*, 8 Haw. 518 (two years); *In re Thompson*, 15 Haw. 155 (one year); *In re McBride*, No. 1310 (two years); *In re Bevins*, 26 Haw. 570 (three months).

Under all the facts and circumstances of this case it is my opinion that a suspension of three years would be ample to subserve the ends of justice.