## IN THE MATTER OF NORMAN K. LYMAN, ATTORNEY AT LAW.

### No. 1816.

TRIAL APRIL 11, 12, 13, 14, 16, 1928.　　　DECIDED APRIL 26, 1928.

PERRY, C. J., BANKS AND PARSONS, JJ.

OPINION OF THE COURT BY PERRY, C. J.

This is an information by the attorney general charging the respondent, who is an attorney duly licensed to practice in all the courts of the Territory, with professional misconduct. Four offenses are charged. The main issues involved are questions of fact. Upon these many witnesses were examined, the trial consuming five days. The charges will be referred to seriatim.

(1) Undisputed evidence shows that on or about August 12, 1927, an automobile driven by one Ralph S. Hall was in a collision with one Rudolph Stein on one of the highways of this city; that Stein was at the time under the influence of liquor and received certain injuries, not serious, in the accident; that the following morning Stein, having in the meantime read in the morning paper a report of the accident and of the name and the place of employment of the driver of the automobile, telephoned to Hall and invited financial assistance; that Hall said he would call on him, but was advised by

a friend not to do so and did not go; that on August 16, about 4:30 P.M., Hall found on his desk a memorandum to the effect that the respondent requested that Hall call him by telephone; that Hall immediately did as requested and learned from the respondent that Stein and the respondent desired him to call at the respondent's office; that immediately thereafter Hall, in company with George Nowell, an attorney at law and a member of the bar of this court, proceeded to the police station, which was next door to the respondent's office, and there examined the police report of the accident and thence went directly to the respondent's office; that there they met respondent and Stein and an interview followed; that some reference having been made to the accident, the respondent asked Stein how much money he would take; that Stein left it to the respondent to say and that respondent asked him if $25 would do; that Stein said something by way of demurring to the smallness of the amount and that nothing further was said at this juncture except that Nowell, speaking for Hall, said that Stein had a right to have Hall arrested if he wanted to and that they (Hall and Nowell) could not stop him and thereupon left the respondent's office. Upon some of the essentials the evidence of the respondent contradicts that of the prosecution. Hall's testimony is that when he called the respondent by telephone the respondent said that Stein had issued a warrant for Hall's arrest but that he, the respondent, did not want to have it executed until he had had a talk with Hall about it and that perhaps it would not be necessary to execute it at all; and, further, that at the respondent's office the respondent handed the warrant of arrest to Hall, the latter examining it, and that this was before the respondent addressed to Stein the question, "What will you take to fix this up, Stein?" or "What do you

want to fix this up?" or words to that effect. Nowell's testimony corroborates Hall's evidence as to what was said in the respondent's office, although he says that he does not recall respondent's handing the warrant to Hall. Stein, called by the respondent as a witness, testified that he heard the respondent say to Hall over the telephone that he, Stein, was going to serve the warrant and that the respondent told him at the conclusion of the telephonic communication that Hall had thereupon said to the respondent, "For goodness' sake, don't, hold that warrant, don't serve it, I'll be right over." The respondent's testimony, on the other hand, was in brief that what he said to Hall over the telephone was that a "complaint" had been made by Stein against Hall concerning the accident and that he, the respondent, wished to see Hall about it; that at his office he did not produce or exhibit the warrant of arrest and that he did not even know, until after the interview ended and Hall and Nowell had left his office, that a warrant had been sworn to by Stein. In answer to a question by the court the respondent stated in direct terms that the talk with Hall and Nowell in his office centered around the possibility of a damage suit and that there was no reference to a possible arrest. Here is a direct conflict upon an important matter. The picture presented by the testimony of Hall and Nowell is that of an interview at which an arrest was distinctly threatened, followed by a suggestion by the respondent on behalf of Stein to settle for $25. The essence of the statement of the respondent is that the interview related to the possibility of a civil suit for damages and that there was no reference to the possibility of an arrest. This particular question is one of the credibility of witnesses. Hall and Nowell are both apparently young men of good character. There is not a word of testi-

mony reflecting upon them with respect to their character or to their reputation. Hall is an accountant, an Englishman by birth, who has resided in the Territory of Hawaii only since February, 1927. Mr. Nowell is a graduate of Stanford University and was admitted to the bar of this court in April, 1926. Other than in the instance under consideration, it does' not appear that either of them has ever had any dealings with the respondent or that any cause exists for either of them to bear ill will against the respondent. The impression that they gave us while testifying on the stand was that of entire reliability. They volunteered nothing detrimental to the respondent and on the contrary made every concession that possibly could be made in his favor. We believe that they were conscientious and truthful in the giving of their testimony. They had no motive for testifying falsely against the respondent. Our finding is, in accordance with the testimony of Hall and Nowell, that over the telephone the respondent made known to Hall and at the conference repeated to him and to Nowell that a warrant had been secured by Stein for the arrest of Hall in connection with the automobile accident and that the proposal or suggestion by the respondent on behalf of Stein that the payment of $25 would "fix" or settle the matter was intended by the respondent to be made effective by the threat of the warrant and that Nowell correctly understood at the time, as he testified at the trial, that if the $25 was paid by Hall the warrant would not be served and that if the $25 was not paid the warrant would be served.

(2) One Choy Wan Kil, a Korean, was, on December 14, 1926, sentenced, after conviction, by the Honorable W. T. Rawlins, one of the judges of the United States district court for the district of Hawaii, to imprisonment for a term of eighteen months. In May,

1927, he became, under the Federal laws, eligible to parole and the jailer of Oahu Prison where he was confined so certified to the United States district attorney. At that time he had served one-third of his term (less lawful deductions). During the month of May, 1927, a fellow prisoner, Chun Tai Kil, also a Korean, advised Choy Wan Kil to consult the present respondent and to secure his assistance in obtaining release from prison before the expiration of his term. Choy Wan Kil, acting upon the advice, sent for the respondent. After a few days the respondent called on him at the prison and had a conference with him and with Chun Tai Kil. A second visit by respondent to the jail followed a few days later, at which time another interview was held between him and the two Koreans. As a result of these interviews Choy Wan Kil employed the respondent to secure for him as his attorney a shortening of the period of imprisonment. On June 2, 1927, Choy Wan Kil paid the respondent $200 for his professional services in the matter. When the respondent was first requested to serve in the capacity stated he, upon his own statement at the trial herein, was entirely ignorant as to the procedure to be followed in order to secure the parole of a prisoner serving a Federal sentence. On two occasions he inquired of an assistant United States district attorney what the procedure was and was told in effect that he must first secure the recommendation of Judge Rawlins and that the proceeding could not be commenced by or through the district attorney's office. On two occasions he called on Judge Rawlins and orally asked him to recommend the parole of his client. On each occasion the judge told him promptly and definitely that he would not recommend parole in this case because there were two classes of cases in which he did not care to recommend paroles, one being white slave cases and

the other being cases of peddlers of narcotics. Conviction in the Choy Wan Kil case was for peddling narcotics. The judge also informed him at one of these interviews that he had already forwarded a letter to the United States district attorney declining to recommend a parole for Choy Wan Kil. The interviews had by the respondent with the district attorney occupied not more than from five to fifteen minutes each and the two interviews had by him with Judge Rawlins did not in the aggregate occupy more than twenty minutes. In addition, the respondent examined the statutory provisions relating to parole of Federal prisoners contained in "The Code of Laws of the United States of America in force December 6, 1926," being Volume 44, part 1, U. S. Statutes at Large, and on the occasion of his first visit at the jail obtained from his client the date of his conviction and the length of the term for which he was sentenced, made some calculations resulting in the finding that he had served about six months and made notes of what he had learned, a proceeding (at the jail) occupying in the aggregate, in the language of the respondent himself, "a couple of minutes." He did not prepare any written application, formal or informal, for parole, did not prepare or forward any letter to any official, either in Washington, D. C., or in Honolulu, on the subject and rendered no services in the matter other than as here detailed. He did not at any time seek to ascertain what cause or causes there might be in the facts of the case which might possibly influence those in authority to grant his client a parole. He has not disclosed at this trial the existence of any such cause unless it be the fact that Choy Wan Kil desired a parole, which latter, of course, does not in itself constitute a good cause.

The evidence of the two Koreans is that the respond-

ent represented to Choy Wan Kil that he could secure for him a release from prison after the expiration of three months more of his sentence and that his fee, which he stipulated should be paid in advance, for his services would be $200. The respondent's testimony is that he did not represent that he could obtain a release from jail in three months, that he merely said that he would do the best he could and that the agreement was that a retainer of $200 should be paid in advance and that an additional fee of $300 should be paid if the respondent's efforts were successful. Under this charge there is no conflict in the evidence, except upon these two points. The fact that the employment was at the request of Choy Wan Kil and was not sought by the respondent is undisputed. So, also, is the fact that when he was first requested to serve the respondent was wholly ignorant of the proper procedure in such cases and so also are the facts concerning the nature and the extent of the services which were rendered by the respondent and of the things which were not done by him on behalf of his client. If this charge stood alone against the respondent, we might be under some difficulty in determining the question of credibility which is involved in the two respects above stated, that is to say, with reference to the amount of the fee and with reference to whether the respondent represented to Choy Wan Kil that he could secure for him release from prison at the end of three months. Taken in connection, however, with the other charges in the case and the facts, circumstances and evidence thereunder, we believe and find that the respondent did represent to Choy Wan Kil that he could secure freedom for him at the time stated and that his fee for so doing would be $200, payable in advance. It is not a matter of great consequence, however, whether the $200 payment was understood to

be by way of retainer only or by way of an entire fee, or whether the representation was or was not made that success could be attained. Under the statutes of the United States applicable in such cases the power of granting paroles is vested in boards composed of "the superintendent of prisons of the Department of Justice, and the warden and physician of each United States penitentiary" and it is provided that "in every case where a prison other than a United States penitentiary is used for the confinement of such prisoners it shall be the duty of the Attorney General to designate the officers of said prison who, together with the superintendent of prisons shall constitute such board for said prison." Code of Laws U. S. A., in force Dec. 6, 1926, 44 U. S. Stat. at L. 515, § 715. This board is authorized to "establish rules and regulations for its procedure subject to the approval of the Attorney General." *Ib.* Under that authority one of the established rules is, as stipulated by counsel in this case, that persons recommended for parole, later denied by the Attorney General, can make another application for parole at the expiration of one year from the first application and not before. The undisputed evidence of Judge Rawlins is that in practice the board of parole ordinarily follows the recommendation of the sentencing judge. Within one year after Judge Rawlins' refusal to recommend a parole for Choy Wan Kil by his letter of June 1, 1927, Choy Wan Kil's sentence would have expired by its own terms. While the parole board had the power to grant an application, even against the refusal of the judge to recommend one, no effort was made by the respondent to secure favorable action by the board, the reason given by him before this court for his inaction being that he "deemed it a discourtesy to go over the head of the judge with whom I have to meet for the next

four years,"—in itself, incidentally, not a creditable motive for inducing the respondent to fail to use his best efforts on behalf of his client.

The services which the respondent rendered were of a low grade. Aside, possibly, from the brief reference to the Federal statutes, they were such as could have been performed by any man of intelligence other than a lawyer. The sum of $25 would be liberal compensation for the services. No effort was made to secure a pardon or commutation of sentence. No reason, apparently, existed for the exercise of clemency, whether by the pardoning power or by the board of parole. No such reason was sought and none was ever mentioned to the district attorney or to the Federal judge. It was a highly reprehensible thing for an attorney under these circumstances to accept from an ignorant man a fee of $200, whether upon the representation that the desired relief could be obtained or without that representation. Whether this misconduct alone would merit permanent disbarment is, perhaps, a question upon which opinions might differ. In the light of our conclusions upon other branches of this case, that question need not be decided.

(3) One John Costa Pimentel, being pressed by creditors, consulted the respondent and was advised to go into bankruptcy. The necessary papers were prepared in the respondent's office and were filed in the Federal court. Subsequently the referee discovered that the petitioner had once before passed through bankruptcy and that the necessary period of time had not elapsed which would render it lawful for him to obtain a second discharge from his debts. The second proceeding in bankruptcy thereupon terminated. Two days later Pimentel called at the respondent's office and told him that garnishment suits against him had been commenced

by some creditors and that other similar suits were in contemplation by other creditors and asked him what to do about it. The respondent asked him whether he had any relatives. Pimentel replied that he had a brother. The respondent thereupon advised him to execute a promissory note in favor of his brother in the sum of $500 and to have an action brought by his brother on the note, garnisheeing the proper officer of the City and County of Honolulu (John C. Pimentel was at that time a police officer, drawing a salary from the city and county), explaining that his brother could collect under the garnishment and transfer to him the amounts so collected from time to time. The client assenting, the respondent referred him to one of his clerks, Lee by name, with instructions to have the note and suit prepared. The promissory note was thereupon prepared by the clerk, reading as follows:

"$500.00          Honolulu, T. H., January 15, 1927.

"For value received on demand I promise to pay Charles C. Pimentel or order the sum of five hundred dollars with interest thereon at the rate of 6% per cent. per annum from date hereof until paid.

"Principal and interest payable in gold coin of the government of the United States of America of the present standard of weight and fineness at Honolulu, T. H. And in the event suit or action is instituted to collect this note, I agree to pay a reasonable sum as and for attorney fees in addition to the principal and interest due or to become due hereunder."

This note John Costa Pimentel signed in the respondent's office. In the declaration prepared in respondent's office in pursuance of these arrangements the allegation is made "that heretofore, and on to-wit, the 15th day of January, 1927, defendant herein did make, execute

and deliver his certain promissory note for the sum of $500.00 to Charles C. Pimentel, said note being in words and figures as follows." A copy of the note was inserted at this point. Another allegation is "that notwithstanding the fact that said note is long past due, and that repeated demand has been made upon said defendant for the payment of same, he, the said defendant, notwithstanding his several promises to pay the same, has hitherto refused and neglected and still so refuse and neglect to pay the same, or any part thereof to the damage of the plaintiff herein." Judgment was prayed for in the sum of $500, plus attorney's commissions and costs of suit and the auditor of the City and County of Honolulu was named as garnishee. At the request of John Costa Pimentel, his brother called at the respondent's office on the next day, signed the declaration and swore to it before a notary public. At the respondent's direction the case was turned over to Mr. J. G. Tyssowski, a member of the bar of this court, to be by the latter presented to the district court of Honolulu as attorney for the plaintiff. Neither at the date of the note nor at the date of these arrangements nor at any other time had John Costa Pimentel borrowed $500 from his brother or owed him that sum of money for any cause whatever. The promissory note was wholly fictitious and so was the action based thereon. The preparation and execution of the note and the institution of the action were suggested and advised by the respondent without any inquiry as to whether any such debt existed and in the belief, as we find, that no such debt existed and that these papers and proceedings were false and fictitious.

Upon appearing in the district court on the return day specified in the summons, Tyssowski was advised by two other attorneys to examine into the facts of his case,

stating that they had reason to believe that the note was fictitious. Subsequently the action was dismissed on motion of Tyssowski.

We make the foregoing findings in spite of the denial of the respondent upon essential points. His testimony is that after the termination of the bankruptcy case John Costa Pimentel came to his office and told him that he owed his brother some money and that he wanted the respondent to bring suit upon the debt; that respondent censured Pimentel for not having informed him that he had had a prior discharge in bankruptcy (Pimentel's evidence is that he had informed the respondent of that fact, but was advised that he could file a second petition) and told him that he did not care to have anything further to do with his case, refused to bring the action on behalf of his brother and turned him over to Lee with instructions to "see what his troubles were"; and that he told Pimentel that if he, Pimentel, wished it, the respondent would ask Tyssowski to handle the case for him and that he later told Tyssowski that Pimentel wanted to bring a suit and that if Tyssowski wanted to handle it he could do so. Respondent denies all knowledge of the fraud and all participation in it. Charles Pimentel testified that he signed the declaration at the request of his brother and without reading the papers. Counsel having both stated in this court that neither of them would ask Lee, the clerk, to take the stand because both had examined him carefully and had concluded that he had lost all memory of the transactions in question, the court requested that he be nevertheless called to the stand. He was examined. Beyond any doubt he was very friendly to the respondent and answered "I don't remember," or words to that effect, in many instances. He did, however, testify that he had prepared the promissory note

in his office, using therefor a partly printed form and filling in the blanks and that upon completing the preparation of the note he had placed it upon the respondent's desk. He further testified that he did remember that the note was given a date by him "several months" earlier than the date when it was actually prepared. Tyssowski, who admitted having been the recipient of many favors at the hand of the respondent and who had been associated with him in many cases, in testifying volunteered much in the respondent's favor. He testified, however, that the respondent had come to his office and said that he would like to have a suit brought in his (Tyssowski's) name as attorney as he (the respondent) had represented the defendant in other matters and thought that it would be better for the witness to be the attorney for the plaintiff.

Although John Costa Pimentel was discharged by the civil service commission from his position as a police officer on account of misconduct, he impressed us favorably on the witness stand. He volunteered nothing against the respondent and admitted freely his own part in the conspiracy. We believe that he told the truth. His story is far more probable than that of the respondent. The various steps as narrated by him follow in natural sequence. When pressed by creditors he sought legal assistance and was advised to go into bankruptcy. When that failed and creditors again began to harass him he again sought his attorney and asked him what to do. Pimentel is not an attorney and cannot well be deemed to have been at that time versed in the law of garnishment. It seems improbable that he himself devised the method adopted for defeating his creditors. It seems improbable that he would know the maximum limit of the jurisdiction of the district court of Honolulu in civil cases, for it was doubtless with that in

mind that the amount of the note was fixed at $500. It seems improbable further that it was he who directed that the note should on its face be made payable on demand and that it should be dated January, 1927, when it was prepared and executed in June of that year. If the respondent was disgusted with Pimentel's part in the bankruptcy case, as he in effect claims in his testimony that he was, the natural and obvious thing for him to do would have been to decline to further represent him in any way and to have anything to do with him again. His statement that while so disgusted he nevertheless turned Pimentel over to his own clerk, Lee, "to see what his troubles were," does not appeal to us as being either probable or true. The fact that Lee, after completing his preparation of the promissory note, placed it upon the respondent's desk clearly indicates that the instructions for its preparation came from the respondent. Nor can we sustain the argument advanced by his attorneys that garnishment suits involving a total of $400 or $500 had been commenced prior to the commencement of the action of Pimentel vs. Pimentel and that therefore the bringing of the latter action would have been fruitless and respondent would not have advised it. The facts in this connection are that one of the garnishment suits referred to was brought by one Nichols on May 10 for the sum of $22.96; another by the same plaintiff was instituted on June 1 for $27.83; another by J. F. Souza on June 7 for $153.28; another by one Pahk on June 7 for $264.57; and another by the Auto Painting Company on June 9 for $98. The fictitious note was ordered, prepared and signed on June 6 and the declaration was signed and sworn to on June 7 and was filed on June 8. In other words, on June 6, when the fraudulent scheme was conceived and suggested, only two suits had been filed against John C.

Pimentel, involving between them less than $51. The remaining suits were at that time only threatened.

(4) At 5:55 A.M. on Thanksgiving Day, 1927, on Kalakaua Avenue in this city, a collision occurred between an automobile driven by one D. L. McKee and a horse-drawn vehicle under the control of a Chinese driver. Without stopping to render assistance to the Chinese, McKee drove on and shortly thereafter another Chinese caught up with him and remonstrated with McKee for his acts and omissions and McKee thereupon dealt him a blow. Again McKee drove on and disappeared from the scene. Later he was arrested and three charges were entered against him, one for what is popularly known as a "hit and run" offense, another for heedless driving and a third for assault and battery. After his arrest McKee consulted the respondent and engaged him as his attorney to defend him. In the district court examination was waived and trial by jury was demanded.

In the automobile with McKee at the time of the collision was a man named Rasmussen. Both McKee and Rasmussen were enlisted in the service of the United States navy, McKee on a submarine and Rasmussen on a ship called the "Sea Gull". One Collins, hereinafter referred to, was in the same service, on a submarine. McKee and Rasmussen were both sons-in-law of one Anna Castro and at the time of the accident were living in the same building occupied by Mrs. Castro. Collins, likewise, lived in the same building, which was located on School Street about two or three miles from the scene of the accident. On the morning of Thanksgiving Day, 1927, Mrs. Castro arose and went into the kitchen to procure some milk for a baby in the house. There was a clock in the kitchen and, looking at it, Mrs. Castro saw that it was then 4:10 o'clock. While thus

attending to the wants of the child she saw McKee and Rasmussen in the house.

At eight o'clock on the morning of the day set for the trial of the "hit and run" charge in the circuit court, McKee, Rasmussen, Collins and Mrs. Castro went to the office of the respondent by appointment. While there their statements were reviewed by way of preparation for the trial. Mrs. Castro stated on that occasion to the respondent that she was up on the morning of Thanksgiving Day between four and five o'clock in order to attend to the wants of the child and that at that time she saw McKee and Rasmussen in the house. Thereupon the respondent asked her to change her statement from "between four and five o'clock" to "between three and four o'clock," giving as a reason that "between four and five o'clock" would be "too near the time of the accident." In consequence of this advice she testified at the trial, under oath, that it was between three and four o'clock in the morning in question that she had gone for the milk for the baby and that she then heard McKee and Rasmussen talking in the house and that she saw them there although on cross-examination her statement was somewhat confused and she finally said that she saw them between four and five o'clock.

Shortly after the interview commenced in the respondent's office on the day of the trial, the respondent advised McKee to shave off a little mustache which he was wearing, giving as his reason for the advice that "that is the way they identified you". McKee removed the mustache before the trial. During the earlier parts of the trial the respondent made a considerable point, in cross-examination of the witnesses for the prosecution, of the fact that the man guilty of the offense was wearing a mustache at the time of the collision, while

the defendant had no mustache at the time of the trial. Towards the end of the trial, however, this attitude was abandoned and the respondent expressly admitted that on the day of the collision the defendant had a mustache.

When the prospective witness, Rasmussen, had completed his statement to the respondent in his office on the morning of the day of the trial the respondent said to him: '"That's the way. Pick out a good story and stick with it." In the courthouse, on the way to the trial, the respondent said, when in company with the four witnesses: "Don't forget the time."

In connection with the visits to the district court McKee had called on the respondent three or four times and he and the three other witnesses had already been in his office at least once shortly after the arrest. At no time did the respondent inquire of McKee whether he had been at the scene of the accident at the time of the collision and what the exact truth of the matter was. Mrs. Castro committed perjury at the trial in the circuit court and did so because the respondent, in his office on the morning of the trial, requested her to do so. Collins at that trial confined himself to what he actually knew and did not commit perjury.

These facts, insofar as they reflect upon the respondent, we find against his denial. He denied that he advised Mrs. Castro to change her testimony with reference to the time when she had seen McKee and Rasmussen in the house, said "I don't recall telling him" (Rasmussen) "to pick a good story," was evasive with reference to the mustache incident, testified that he may have told McKee to go and "get a shave, clean up and put on a coat" and said that he probably said to Mrs. Castro, "Don't forget the time you made in your statement or in your evidence with me." Mrs. Castro impressed us as being a truthful witness. She volun-

teered nothing and clearly was deeply humiliated at having to admit on the stand before us, as she did, that she had committed perjury in the circuit court. When asked by cross-examining counsel if she understood that one who tells an untruth in court can be punished by being sent to the penitentiary, she answered, "Yes, I know, and I will bear it all anyway. I am wrong." Collins in his testimony wholly corroborated what she said as to the advice by respondent to change her statement as to the precise time when she had seen McKee and Rasmussen on Thanksgiving morning. McKee and Rasmussen also corroborated her. The statement by the respondent that "I don't recall telling him to pick a good story" is damaging to him and indicates that he does not and did not at the time of the circuit court trial hold correct views as to the ethics of the profession. To "pick" a story means to "choose" a story. To pick or choose a story means to pick or choose between two or more possible stories. The truth in such a case as this could only have been one thing. There could have been only one true story. There was nothing to pick or choose if the truth was to be adhered to. If an attorney says to a witness to pick a good story, the thought conveyed is of liberty to choose one that is not true. An attorney who practices only in strict accordance with correct principles can have no doubt that he never told a witness to "pick" a good story. The respondent's evasiveness on the subject of the mustache impressed us as meaning that he had told McKee to remove it before the trial,—for the purpose of possibly confusing the witnesses for the prosecution and of rendering identification difficult.

Not only Pimentel but also McKee, Rasmussen and Mrs. Castro had nothing to gain by executing a conspiracy to testify falsely against the respondent. The

proceedings against the respondent, with the testimony to be given by each of these witnesses, would necessarily serve to keep alive the recollection, first, of the share of the two Pimentel brothers in the conspiracy to defraud the creditors, second, the perjury committed by Charles Pimentel in swearing falsely to the declaration in the fictitious suit, and, third, the various perjuries committed by McKee, Rasmussen and Mrs. Castro at the trial on the charge against McKee in the circuit court. All of these witnesses are of sufficient intelligence to have foreseen the evil results which might come to them from further publishing their own wrongdoing. No reason has appeared at the trial before this court for believing that any of these witnesses had any motive for a false accusation against the respondent. It expressly appears that in the McKee matter it was McKee's commanding officer who reported the respondent's doings to the attorney general. The witnesses themselves did not do so. Again, if McKee and his associates had desired to falsely accuse the respondent, they could as well have charged other wrongs to him. The express testimony is that immunity from prosecution was not promised to McKee, Rasmussen, Mrs. Castro or John Pimentel and there is no evidence to the contrary.

If any one of these four charges had stood alone against the respondent it may or may not have been more difficult to ascertain the truth as between the conflicting statements of the respondent on the one hand and of the witnesses against him on the other. Under existing circumstances, however, two witnesses of undoubted good character (corroborated in one particular by Stein himself) have testified against him with reference to the Stein matter. The two Koreans have testified against him in another case,—supported by the

refusal of Leialoha, respondent's witness, to testify that there was any mention of a retainer and that the total fee was to be $500. J. C. Pimentel and to an important degree respondent's own clerk, Lee, have testified against him on a third charge and Mrs. Castro and Collins and two other witnesses have testified against him on the fourth charge. It is considerably more difficult to believe that all of these nine witnesses have deliberately sworn falsely against the respondent and that he alone has told the truth on essential matters. There is no possibility of reconciling the important conflicts in the evidence on any theory of mistake or misunderstanding. It has been deliberate perjury on the one side or the other and we believe that it has been on the part of the respondent.

What the order of this court should be upon the foregoing facts found by us is not open to doubt. The principles applicable to such a case are set forth at some length in the opinion of this court in the case of George K. French, 28 Haw. 47, 60-65. Quoting again from some of the cases there followed:

"It goes without saying that in our profession the highest obligation is to truth and honesty, and that he who would be a lawyer should by his own conduct, as well as by the advice which he gives to his clients, seek to promote truth and establish justice; and while it is a painful duty to perform, yet I conceive it to be a duty from which no judge can shrink, that whenever the conduct of any member of the bar is challenged, if it appears that that conduct is inconsistent with professional obligations, and is evidence of moral dishonesty, the court should, discharging its duty to the profession and the community, strike that man's name off from the roll of the court." *In re Keegan,* 31 Fed. 129, 133.

"The imposition of the penalty is not merely for the

purpose of punishing the wrongdoer. It is even more for the protection of the profession and the public." *In re Humphreys*, 15 Haw. 155, 207.

"The duties imposed upon members of the bar clothe them with important fiduciary responsibilities and make them amenable to obligations that other members of the community do not share. In no other calling should so strict an adherence to ethical and moral obligations be exacted, or so high a degree of accountability be enforced. A good moral character is one of the essential requisites to admission to the bar in this state, and the tenure of office thereby conferred is during good behavior; and when it appears, upon full investigation, that an attorney has forfeited his 'good moral character,' and has by his conduct shown himself unworthy of his office, it becomes the duty of the court to revoke the authority it gave him upon his admission. 'It is a duty they owe to themselves, the bar and the public, to see that a power which may be wielded for good or for evil is not intrusted to incompetent or dishonest hands.' *Mills Case,* 1 Mann, 393." *People* v. *Keegan,* 18 Colo. 237, 239.

"The lawyer's duty is of a double character. He owes to his client the duty of fidelity, but he also owes the duty of good faith and honorable dealing to the judicial tribunals before whom he practices his profession. He is an officer of the court—a minister in the temple of justice. His high vocation is to correctly inform the court upon the law and the facts of the case, and to aid it in doing justice and arriving at correct conclusions. He violates his oath of office when he resorts to deception, or permits his clients to do so. He is under no obligations to seek to obtain, for those whom he represents, that which is forbidden by the law. If he suffers false and perjured testimony to be presented

to the presiding judge, with the possible result of inducing the latter to take jurisdiction of a cause, in which there would otherwise be no power to act, and to grant a judgment or decree which the law would prohibit if the real character of the offered testimony were known, he cannot shield himself behind his supposed obligations to his client." *People* v. *Beattie,* 137 Ill. 553, 574. In this case the attorney presented to the court testimony known by him to be false and with the aid thereof obtained a decree of divorce.

"Too much is staked upon the honesty and good conduct of lawyers for courts to wink at flagrant misconduct. They are trusted by the community with the care of their lives, liberty and property, with no other security than personal honor and integrity. It behooves the courts and the profession to see that their brotherhood keep clean records." *In re Henderson,* 88 Tenn. 531, 539.

"This court has always held that a high sense of personal and professional integrity must be observed by members of the profession, not only toward clients but toward the courts in which they practice. They are a part of the machinery of the law for the administration of justice, and it is indispensable that courts shall in a large measure be able to rely upon their good faith and fair dealing. It is no hardship to make this requirement, and it cannot be relaxed without great detriment to the profession and to the proper administration of justice. Men who cannot conform to the standard fixed must employ their talents in other fields than the legal profession." *People* v. *Barrios,* 237 Ill. 527, 540.

"There can be no question but that the offense is a serious one, involving as it does the relation of an attorney and counselor at law to the court of which he is an officer, and at the same time the obligation of an attorney to his client. Assuming that his professional obliga-

tions to his client would justify his not revealing to the court the facts that he had acquired from his client during the existence of the relation, the obligation to his client did not justify him in deceiving the court or continuing to prosecute a claim which he knew was based upon perjured testimony. Much less would it justify him in producing his client as a witness, and insisting upon her right to recover when he knew that her testimony was knowingly false. By proceeding with the trial after having become aware of the fact that it was based upon perjured testimony, the attorney made himself a party to the attempted fraud upon the court and the defendant." *In re Hardenbrook,* 121 N. Y. S. 250, 257, 258.

When a member of the bar accepts from an ignorant man a fee of $200 for services which he knows he cannot successfully perform or with a reckless disregard as to whether or not he can perform them and without returning to the client the large excess which proves to be unearned and attempts to extort from another a sum of money under the threat of a warrant of arrest which has been issued but has not yet been served and plans, advises and in part executes a conspiracy to defeat the claims of creditors by preparing a fictitious promissory note and the pleadings in an action thereon and by causing the suit to be instituted by an innocent attorney (the contemplated suit including process of garnishment of the debtor's salary, with the intent and upon the understanding that the amounts garnisheed should be returned by the pretended plaintiff to the pretended debtor) and, in defending a person accused of crime, commits subornation of perjury by inducing one of the witnesses for the defense to give testimony known to him (the attorney) to be untrue, his conduct is inconsistent with professional obligations and is evi-

dence of moral dishonesty and he is guilty of professional misconduct and should be disbarred.

An order to this effect will be entered upon presentation.

*W. B. Lymer,* Attorney General, *C. N. Tavares,* Second Deputy Attorney General, and *E. R. McGhee,* Third Deputy Attorney General, in support of the information.

*A. L. Castle,* of the firm of Robertson & Castle, and *J. B. Poindexter* for respondent.